No. 15-50247

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT
_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

STANLEY DAN RECZKO III,

Defendant-Appellant.
_____

**APPELLANT STANLEY RECZKO'S
OPENING BRIEF ON APPEAL**

**FILED PUBLICLY
REDACTED**

Appeal from United States District Court
for the Central District of California
The Honorable George H. King
United States District Judge
No. 07 Cr. 1221 GHK

COLEMAN & BALOGH LLP
ETHAN A. BALOGH
DEJAN M. GANTAR
235 Montgomery Street, Suite 1070
San Francisco, CA 94104
Telephone: 415.391.0440
Email: eab@colemanbalogh.com

Attorneys for Appellant
STANLEY DAN RECZKO III

# **TABLE OF CONTENTS**

INTRODUCTION ...................................................................................1

JURISDICTION...................................................................................3

BAIL STATUS ....................................................................................3

ISSUES PRESENTED...........................................................................3

STATEMENT OF THE CASE...............................................................4

A.    Initial proceedings. ...................................................................4

B.    Conflicts within the defense team, competency evaluations, and various pretrial motions............................................................................6

C.    Reczko's *pro se* tenure, subsequent requests for reappointment of counsel, other pretrial motions, and the evidentiary hearing on the motion to suppress.......................................................................................22

D.    The district court's revocation of Reczko's *pro se* status, trial, and sentencing. ...........................................................................29

STATEMENT OF FACTS ...................................................................30

A.    Overview....................................................................................30

B.    Evidentiary hearing on the motion to suppress evidence. .............................31

C.    The Government's case at trial. ...................................................34

D.    Reczko's defense. .......................................................................40

E.    The bench trial on the section 2260A charge and judicial findings on the section 3559(e) sentencing enhancement. ...................................................41

SUMMARY OF THE ARGUMENT ....................................................41

ARGUMENT ......................................................................................45

i

A.  The district court violated Reczko's Sixth Amendment rights by constructively denying him his right to counsel............................................45

    1.  Introduction and standard of review. ..................................45

    2.  The district court constructively denied Reczko his Sixth Amendment right to counsel by denying his numerous motions for substitute counsel, and permitting his attorneys, with whom he had an irreconcilable conflict, to represent him for a period of almost six years......................................................................................45

        a.  The record demonstrates that Reczko effectively proceeded without the assistance of counsel.............................................46

        b.  *Velasquez* establishes that the district court abused its discretion by denying Reczko's motions for substitute counsel. ..............48

        c.  This Court's earlier cases also demonstrate that the district court constructively denied Reczko his right to counsel. .........53

B.  Reczko's Sixth Amendment rights were further violated by the district court's denial of his requests for reappointment of counsel after he went *pro se*..................................................................................................58

    1.  Introduction and standard of review. ..................................58

    2.  The district court should have construed Reczko's complaints about his inability to represent himself and requests for advisory counsel as revocations of his waiver of counsel, and reappointed counsel, or at a minimum, held a hearing to inquire whether Reczko wished to continue waiving his right to counsel.................................................61

    3.  In any event, the district court should have granted Reczko's unequivocal request for counsel made in December 2014, and appointed Kaloyanides, who had been standby counsel since September 2013, as his attorney.........................................................62

C.  Reczko's jury waiver as to the section 3559(e) sentencing enhancement— which triggered the mandatory life sentence in this case—and the section 2260A charge was unconstitutionally inadequate, requiring reversal..........65

ii

D.  Reczko's prior state conviction did not qualify as a "prior sex conviction" involving a minor under 18 U.S.C. §3559(e). ...............................................70

    1.  Introduction and standard of review. ...................................................70

    2.  Reczko's prior conviction under New York Penal Law section 130.35(1) is categorically overbroad and does not qualify as a predicate under section 3559(e), and the district court erred when it held section 130.35(1) was a categorical match to section 2241(a). ..72

E.  The Court should vacate Reczko's convictions under *Burrage v. United States*, because the jury instructions misstated the law on the "for the purpose of" element of the section 2251 charge, and because the Government failed to submit sufficient evidence that Reczko engaged in sexually illicit conduct "for the purpose of" producing the images. .............75

    1.  Introduction and standard of review. ...................................................75

    2.  There was plain error under *Burrage* and *Miller*. ...............................76

    3.  The error affected Reczko's substantial rights and supports reversal.80

    4.  The Government failed to present sufficient evidence to sustain a conviction on the section 2251(c) count under *Burrage v. United States*. ....................................................................................81

F.  The district court abused its discretion when it denied Reczko's Rule 15 motions as to witnesses Judge Gil Acosta and Mary Lou Cabanas. ............82

    1.  Introduction and standard of review. ...................................................82

    2.  The district court's exclusive focus on the witnesses' apparent refusal to cooperate when denying the motion was an abuse of discretion....84

G.  Reczko's mandatory life sentence under 18 U.S.C. § 3559(e) violates the Eighth Amendment. .........................................................................................87

H.  The Court should reverse Reczko's convictions and sentence for cumulative error. ...............................................................................................93

CONCLUSION ....................................................................................................94

## TABLE OF AUTHORITIES

**Cases**

*Bittaker v. Woodford*,
    331 F.3d 715 (9th Cir. 2003) ........................................................48

*Bradley v. Henry*,
    510 F.3d 1093 (9th Cir. 2007) ............................................. 57, 58

*Brown v. Craven*,
    424 F.2d 1166 (9th Cir. 1970) ............................................. 46, 56

*Burrage v. United States*,
    134 S. Ct. 881 (2014)............................................................ *passim*

*Campbell v. Rice*,
    408 F.3d 1166 (9th Cir. 2005) (*en banc*)............................... 57, 58

*Deck v. Jenkins*,
    814 F.3d 954 (9th Cir. 2016) ........................................................79

*Dixon v. Williams*,
    750 F.3d 1027 (9th Cir. 2014) ............................................. 79, 80

*Ellis v. Harrison*,
    USCA Case No. 16-56188 (9th Cir. 2018)...................................46

*Ewing v. California*,
    538 U.S. 11 (2003)........................................................................88

*Graham v. Florida*,
    560 U.S. 48 (2010)........................................................................88

*Henderson v. United States*,
    133 S. Ct. 1121 (2013)..................................................................78

iv

*Ho v. Carey*,
    332 F.3d 587 (9th Cir. 2003) ..........................................................................80

*In re Ellis*,
    356 F.3d 1198 (9th Cir. 2004) ......................................................................93

*Lockyer v. Andrade*,
    538 U.S. 63 (2003)..........................................................................................88

*McCormick v. Adams*,
    621 F.3d 970 (9th Cir. 2010) ........................................................... 59, 61, 63

*Menefield v. Borg*,
    881 F.2d 696 (9th Cir. 1989) ........................................................... 42, 45, 60

*Parle v. Runnels*,
    505 F.3d 922 (9th Cir. 2007) ........................................................................93

*Taylor v. United States*,
    495 U.S. 575 (1990)........................................................................................72

*United States v. Alferahin*,
    433 F.3d 1148 (9th Cir. 2006) ......................................................................75

*United States v. Bevins*,
    848 F.3d 835 (8th Cir. 2017) ........................................................................92

*United States v. Brown*,
    352 F.3d 654 (2d Cir. 2003) ........................................................................78

*United States v. Brown*,
    879 F.3d 1043 (9th Cir. 2018) ......................................................... 70, 72, 73

*United States v. Christensen*,
    18 F.3d 822 (9th Cir. 1994) ............................................................... 66, 67

*United States v. Cochran*,
    770 F.2d 850 (9th Cir. 1985) ........................................................... 43, 65, 67

v

*United States v. Doss,*
    630 F.3d 1181 (9th Cir. 2011) ............................................................... 68, 71

*United States v. Fernandez,*
    388 F.3d 1199 (9th Cir. 2004) .........................................................................94

*United States v. Frederick,*
    78 F.3d 1370 (9th Cir.1996) ...........................................................................93

*United States v. Fuchs,*
    218 F.3d 957 (9th Cir. 2000) .................................................................. 75, 76

*United States v. Goyal,*
    629 F.3d 912 (9th Cir. 2010) ..........................................................................81

*United States v. Hantzis,*
    625 F.3d 575 (9th Cir. 2010) ............................................................ 45, 58, 61

*United States v. Henry*,
    827 F.3d 16 (1st Cir. 2016)..............................................................................92

*United States v. Hinkley*,
    803 F.3d 85 (1st Cir. 2015)..............................................................................92

*United States v. Hinkson*,
    585 F.3d 1247 (9th Cir. 2009) (*en banc*).......................................................82

*United States v. Johnson*,
    451 F.3d 1239 (11th Cir. 2006) .....................................................................92

*United States v. Laney*,
    881 F.3d 1100 (9th Cir. 2018) ............................................................... 65, 66

*United States v. Miller*,
    767 F.3d 585 (6th Cir. 2014) .................................................... 75, 77, 78, 81

*United States v. Necochea*,
    986 F.2d 1273 (9th Cir. 1993) ......................................................................94

vi

*United States v. Olafson*,
    213 F.3d 435 (9th Cir. 2000) ................................................................ 82, 86

*United States v. Omene*,
    143 F.3d 1167 (9th Cir. 1998) ........................................................................83

*United States v. Orduno-Aguilera*,
    183 F.3d 1138 (9th Cir. 1999) ........................................................................81

*United States v. Recio*,
    371 F.3d 1093 (9th Cir. 2004) ........................................................................80

*United States v. Sanchez-Lima*,
    161 F.3d 545 (9th Cir. 1998) ................................................................... 83, 85

*United States v. Shorty*,
    741 F.3d 961 (9th Cir. 2013) ................................................................ *passim*

*United States v. Sines*,
    761 F.2d 1434 (9th Cir. 1985) ........................................................................83

*United States v. Springer*,
    51 F.3d 861 (9th Cir. 1995) ...........................................................................58

*United States v. Sullivan*,
    797 F.3d 623 (9th Cir. 2015) .........................................................................92

*United States v. Tamman*,
    782 F.3d 543 (9th Cir. 2015) .........................................................................67

*United States v. Thompson*,
    587 F.3d 1165 (9th Cir. 2009) ................................................................ 59, 60

*United States v. Velazquez*,
    855 F.3d 1021 (9th Cir. 2017) ............................................................. *passim*

*United States v. Williams*,
    594 F.2d 1258 (9th Cir. 1979) ............................................................. *passim*

*United States v. Williams*,
    636 F.3d 1229 (9th Cir. 2011) ........................................................88

*United States v. Yamashiro*,
    788 F.3d 1231 (9th Cir. 2015) ............................................. 57, 58

*United States v. Zuno-Arce*,
    44 F.3d 1420 (9th Cir. 1995) ........................................................83

*Waddington v. Sarausad*,
    555 U.S. 179 (2009)......................................................................80

**Statutes**

18 U.S.C. § 2241 ................................................... 43, 72, 73, 74

18 U.S.C. § 2246 ...........................................................................72

18 U.S.C. § 2251 .................................................................. *passim*

18 U.S.C. § 2252A ................................................................ 91, 92

18 U.S.C. § 2260A ............................................................. 4, 5, 25

18 U.S.C. § 2423 ..........................................................................4, 5

18 U.S.C. § 3231 .............................................................................3

18 U.S.C. § 3559 .................................................................. *passim*

28 U.S.C. § 1291 .............................................................................3

Cal. Pen. Code § 311.4.................................................................90

N.Y. Pen. L. § 10.00 ............................................................... 73, 74

N.Y. Pen. L. § 130.00 ....................................................................71

N.Y. Pen. L. § 130.35(1)..................................................... *passim*

**Other Authorities**

FAMILY CODE OF THE PHILIPPINES, Ch. 3, Art. 35 ...................................37

Philippines Republic Act No. 8353, Ch. 3, Art. 266 .............................37

**Rules**

California Rule of Professional Conduct 3-100.................................47

Fed. R. App. P. 4(b)(1)(A) .........................................................3

Fed. R. Cr. P. 23...................................................................66

Fed. R. Crim. P. 15................................................................82

## INTRODUCTION

Stanley Reczko spent seven and-a-half years in pretrial detention after being arrested in the Philippines for having sex with Elecita Del Rosario, then a 16-year old female whom Reczko reasonably believed was 18, and whom he had married with her parents' approval. For approximately six of those years, Reczko was represented by two attorneys who repeatedly sought to withdraw from his case, unequivocally represented their contempt for him, and candidly admitted conflicts in their representation. Trial counsel also attacked each other, accused one another of misconduct and client abandonment, and at times asked the district court remove the other from the case. Unsurprisingly, Reczko repeatedly sought substitute counsel. On all occasions, the district court repeatedly refused to appoint new conflict-free attorneys.

Left with no choice, Reczko moved to represent himself in a criminal case that carried a potential mandatory life term. Despite a prior competency report finding him incompetent to proceed *pro se* and his obvious mental instability, the district court granted Reczko's *Faretta* motion and allowed him to self-represent.

Reczko quickly realized that he was ill-equipped to act as his own counsel in this life-case, in light of the case's complexity, voluminous discovery, and his lack of access to legal resources while in custody. Reczko requested the court reappoint counsel, but the district court refused.

1

After rejecting a 10-year plea offer, Reczko proceeded to jury trial on a single count of production of child pornography. On the first day of trial, Reczko suffered a mental breakdown in open court. The district court then revoked his *pro se* status, and ordered standby counsel to step in; the same standby counsel who only weeks before informed the court that he was unprepared to represent Reczko at trial. The jury convicted.

Despite an invalid jury waiver, the court then proceeded to a bench trial on the remaining charge, which alleged that Reczko had committed the child pornography offense while having to register as a sex offender. The court found Reczko guilty, found that his 1996 state court prior conviction qualified as an 18 U.S.C. § 3559(e) predicate offense, and sentenced Reczko to a mandatory life-term.

This Court should reverse. As shall be shown, the district court constructively denied Reczko's right to counsel, denied his right to trial on the prior conviction, errantly sustained the sentencing enhancement, and incorrectly instructed the jury on the elements of the substantive offense, amongst other errors.

## JURISDICTION

The district court obtained jurisdiction under 18 U.S.C. § 3231, and entered

judgment on May 21, 2015. ER 1.[1]  Reczko timely noticed his appeal on May 27,

2015. ER 114; Fed. R. App. P. 4(b)(1)(A). This Court possesses jurisdiction

pursuant to 28 U.S.C. § 1291.

## BAIL STATUS

Reczko remains imprisoned at the United States Penitentiary, in Tucson,

Arizona, where he is serving a sentence of life imprisonment, plus 10 years.

## ISSUES PRESENTED

1.      Whether the district court constructively denied Reczko his Sixth

Amendment right to counsel when it denied trial counsels' and defendant's

requests—both individually and cumulatively—for new counsel to be appointed?

2.      Whether the district court's denial of Reczko's requests for

reappointment of counsel after he went *pro se* constituted a denial of counsel in

violation of the Sixth Amendment?

3.      Whether Reczko's waiver of his right to a jury trial was invalid?

4.      Whether Reczko's 1996 state court conviction qualified as a predicate

offense under 18 U.S.C. § 3559(e)?

---

[1] As used herein, "ER" refers to appellant's Excerpts of Record, and "CR" to the Clerk's Record of district court proceedings.

3

5.      Whether, pursuant to *Burrage v. United States*, 134 S. Ct. 881 (2014), the jury instructions misstated the law on the "for the purpose of" element of section 2251(c), and whether, pursuant to that same case, the Government failed to present sufficient evidence on the section 2251(c) offense?

6.      Whether the district court erred when it denied Reczko's Rule 15 motions as to two witnesses who could have provided critical exculpatory testimony?

7.      Whether Reczko's mandatory life sentence under 18 U.S.C. § 3559(e) violates the Eighth Amendment?

8.      Whether this Court should vacate the convictions and remand for new trial based on cumulative error?

## STATEMENT OF THE CASE

### A.      Initial proceedings.

On November 2, 2007, a grand jury returned an indictment charging Reczko with four counts of traveling in foreign commerce to the Philippines for the purpose of engaging in illicit sexual conduct in violation of 18 U.S.C. § 2423(b), and one count of traveling in foreign commerce and engaging in illicit sexual conduct in violation of 18 U.S.C. § 2423(c). CR 14. The indictment also alleged Reczko committed those offenses while being required to register as a sex offender pursuant to 18 U.S.C. § 2260A. *Id.*

4

The district court appointed attorney Larry Bakman to represent Reczko on November 9.  *See* CR 22.

On April 1, 2008, the Government filed a superseding indictment alleging one violation of 18 U.S.C. § 2423(c), two violations of 18 U.S.C. § 2423(b), and one violation of 18 U.S.C. § 2251(c)(1), production of child pornography, with intent or actual transportation of the images to the United States.  CR 29.  The Government also charged a sentencing enhancement under 18 U.S.C. § 3559(e)(1), alleging Reczko had a prior sex conviction involving a minor, and one violation of 18 U.S.C. § 2260A.  *Id.*  On April 18, 2008, the district court appointed attorney Lisa Bassis as associate counsel.  ER 945.

For the following year, the parties primarily litigated issues concerning discovery production, the retrieval of data from damaged media, the use of foreign depositions to conduct witness interviews in the Philippines, the use of the Mutual Legal Assistance Treaty ("MLAT"), and various other issues concerning third-party, International Justice Mission ("IJM"),[2] including IJM's assistance to the United States and Philippine governments in investigating and arresting Reczko in

---

[2] As discussed in further detail below, IJM is an international NGO that conducts investigations and collects evidence on behalf of alleged victims of child and sex trafficking.

the Philippines. *See e.g.*, CR 51, 67, 82, 84, 87, 91, 94, 97, 99, 104, 134, 1189, 1190, 1214.[3]

**B.  Conflicts within the defense team, competency evaluations, and various pretrial motions.**



At a status conference held on May 21, Bakman and the Government expressed concerns regarding Reczko's competence.  CR 1193 at 6-9.  Following a brief off the record conference between Bakman and Reczko, Bakman informed the court that Reczko wished to withdraw his motion to proceed *pro se*.  *Id.* at 10-12.

---

[3] Because this litigation does not concern the issues presented in this appeal, Reczko omits detailed discussion of it here.

6

[REDACTED]

At a status conference held on July 27, Reczko renewed his request for new counsel. CR 1194 at 13-14. The district court refused to entertain Reczko's request, and instead noted that it first had to make a determination as to his competency, and ordered an evaluation by Dr. Saul Faerstein. *Id.* at 14-16. Dr. Faerstein concluded that Reczko was competent to proceed to trial, but not competent to proceed *pro se*. CR 150. Thereafter, on October 9, 2009 the court noted its continued reservations about Reczko's competency, but nonetheless found him competent to stand trial. CR 1195 at 7, 14-15.

7



. The court also denied his request to proceed *pro se*, based on Dr. Faerstein's earlier competency report. ER 113.

On August 25, the defense filed motions pursuant to Federal Rule of Criminal Procedure 15, seeking to depose foreign witnesses for the purpose of preserving testimony for pretrial motions. CR 224, 225, 233. On October 12, the court denied these motions, finding the defense failed to show that some of these witnesses would be unavailable to testify, and as to what the witnesses would testify about. ER 111-12.

███████████████████████████████████████████

████████████████████████████████  The court granted her request, but in

a public filing, strongly admonished Bassis for threatening to withdraw from the

case, "especially so after she ha[d] undoubtedly submitted not insubstantial billings

at the public's expense."  CR 246 at 2.  The court further ordered Bakman to assist

Bassis in the preparation of all pretrial motions.  *Id.* at 1.

In April 2011, Reczko filed various motions, including a motion to dismiss

Counts One through Three of the First Superseding Indictment,[4] CR 264, a motion

to dismiss Count Four, or in the alternative, strike the section 3559(e)

enhancement, an Eighth Amendment challenge to section 2251(c)(1), CR 265,[5] and

a motion to bifurcate the enhancement allegations.  CR 258, 266.[6]

At the same time, Reczko also moved to suppress evidence seized by the

IJM under the Fourth Amendment, on a "joint venture" theory, specifically arguing

---

[4] The Government dismissed these counts (the section 2423 charges) on
December 14, 2012.  CR 1073 at 27-28.

[5] The court denied these motions in August 2012.  CR 414, 419.

[6] On July 31, 2012, the court found the issue "unsuitable for resolution" and
found that the section 3559(e) enhancement and the section 2260A charge were
"ideal candidates for a bench trial."  CR 404 at 1.  The court ordered the parties to
submit a joint status report, whereby Reczko would state whether he would waive
jury on the section 3559(e) sentencing enhancement and the section 2260A charge.
*Id.* at 2.

that IJM acted as an "agent" of the United States in collecting evidence against

him.  CR 261, 263; *see also* CR 440 (supplemental motion to suppress).

10



_____

⁷On December 22, 2011, Dr. Faerstein concluded that Reczko was competent to stand trial.  CR 390 at 5.  On January 17, 2012, Dr. Faerstein submitted a follow-up report that reached the same conclusion.  CR 348, 351.

11



On October 24, 2011, the court issued an Order admonishing both counsel for unprofessional conduct, and ordered them to work together.  CR 322.

On December 27, Reczko moved *pro se* for substitute counsel, and made various allegations which included his lack of access to discovery, that his attorneys would not meet with him, and that there was "a serious breakdown in communication[.]"  CR 346.

At a status conference held January 18, 2012, Bakman challenged the doctor's findings, and Reczko again requested his attorneys be removed from the case.  CR 390 at 4-8.[9]  On March 9, 2012, the district court granted Bakman's request for another competency evaluation, and denied Reczko's request for a new attorney.  ER 109-10.

On June 7, Reczko again moved for new counsel.  CR 392.  Reczko argued there had been a complete breakdown in communication, and noted "[t]he irreconcilable differences that exhist [sic] jeopardize my ability to have a fair and unprejudiced trial[.]"  *Id.*

---

[9] Shortly thereafter, Reczko submitted several largely unintelligible *pro se* filings.  *See e.g.,* CR 356, 360, 366, 374.  He also continued to ask for substitute counsel.  *See e.g.,* 360.

13

Dr. Lisa Hope submitted another competency evaluation on May 24, 2012, finding Reczko competent to stand trial, and the district court found Reczko competent to proceed on June 18, 2012.  CR 395.

On June 27, the court held a hearing regarding Reczko's competency and his motions to relieve counsel.  CR 1201, 396.  In a closed session, ████████

████████████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████

On July 3, the court denied Reczko's motion to relieve or substitute counsel.  ER 108, 599-605. ████████████████████████████████████

14

████████████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████

     In response to the court's Order to Show Cause why defense counsel had not

met court imposed filing deadlines, *see* CR 403, on August 6, 2012,█████████

████████████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████

     On August 8, the district court issued an Order admonishing counsel for

their failures to meet deadlines and comply with court Orders:

> Why counsel for either side would believe that they
> cannot only fail to work cooperatively, but that they can
> flout our deadlines, ignore our orders, and fail to keep us
> apprised of the reasons for their failures until we issue an
> order to show cause why they should not be sanctioned
> for failing to comply with our orders is almost
> unfathomable.  To put it mildly, our patience has worn
> thin.

CR 409.  In that Order, the district court threatened counsel with sanctions if they

continued to flout the Court's orders, including imprisonment.  *Id.* at 4.

     On August 23, Reczko again requested substitute counsel.  ER 584-87.  The

district court didn't then respond.

On September 12, the defense again moved to conduct foreign depositions under Rule 15. ER 157. The Government too moved for its own depositions under Rule 15 on that same date. CR 428.[10] The defense sought to depose a total of 22 foreign witnesses. Those witnesses included Mary Lou Cabanas, Judge Gil Acosta, and Christopher Derama, *i.e.*, the persons who facilitated Reczko's marriage to Del Rosario at the Cebu City courthouse. ER 168. The defense argued that these witnesses would help establish Reczko's "mistake of age" defense. ER 142. The defense further proffered that Del Rosario's family submitted fraudulent documents which showed that Del Rosario was of majority status to facilitate the marriage, and that these documents were then provided to Judge Acosta to support the performance of the marriage ceremony. ER 150-51. The defense argued that this marriage ceremony, and the documents submitted by the Del Rosario family, established that Reczko reasonably believed Del Rosario was of majority. ER 151.

A few days later, on September 17, █████████████████████████

████████████████████████████████████████████████████████

████████    ███████████████████████████████████████████

████████████████████████████████████████████

---

[10] The Government later withdrew its motion. *See* CR 1206 at 11.

[11] ████████████████████████████████████████████
████████████████████████████████████████████████████





by another attorney who represented Bassis who sought to speak with him about a conflict he believed Bassis had in Reczko's case. *Id.* Bakman believed that Bassis hired this attorney for a possible administrative or criminal investigation regarding Reczko's case. ER 405-06.



On December 14, the court held a hearing on Reczko's bifurcation motion. CR 503. Bakman informed the court that Reczko was "in agreement that it would be in his best interest to waive jury on the [section 3559(e)] enhancement . . . and as to Count 5." ER 101. The court conducted a colloquy with Reczko. ER 103-07. The court advised Reczko he had the right to have a jury determine those facts, and that "in order to avoid potential information going before the jury while they are deciding whether you are guilty of [the other counts], you may wish to consider

19

this alternative practical solution." ER 105. The court then accepted an oral jury waiver as to the section 3559(e) sentencing enhancement and the section 2260A offense. ER 106-07.

The court held a status conference on January 17, 2013, where Bakman again raised concerns about Reczko's competence, and complained to the court that Reczko had recently filed a "frivolous" *pro se* notice of appeal. CR 1206 at 5-7. Bakman further informed the court that he was moving to withdraw from representing Reczko on that appeal, which put him in "conflict with Mr. Reczko over that issue as well." *Id.* at 8. ██████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████

On January 18, 2013, the court denied in part Reczko's Rule 15 motion. ER 96-98. The court denied Reczko's request to depose Mary Lou Cabanas, and Judge Gil Acosta, on the basis that both had "expressly stated that they [were] unwilling to cooperate at trial or deposition." *Id.*

█████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████████████

On May 2, Reczko filed a *Faretta* motion, requesting the court allow him to self-represent. CR 562, 567. On May 15, the court again appointed Dr. Faerstein to evaluate whether Reczko was competent to proceed *pro se*. CR 566.[13]

███████████████████████████████████████

███████████████████████████████████████

████████████████████████████████ In a public Order, the court denied her application, noting that the report she attached to her application showing her diagnosis of depression was conclusory and insufficient. ER 94.

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

---

[13] The court subsequently appointed Dr. Lisa Hope to conduct this evaluation, as Dr. Faerstein did not accept the appointment. CR 573. Of note, Dr. Faerstein is a psychiatrist, *see* https://www.healthgrades.com/physician/dr-saul-faerstein-3fcw2, and Dr. Hope a psychologist, *see* https://membership.appic.org/directory/display/736.

21



The court summarily denied her request on August 1.  ER 93.

## C. Reczko's *pro se* tenure, subsequent requests for reappointment of counsel, other pretrial motions, and the evidentiary hearing on the motion to suppress.

On July 23, Dr. Hope submitted a competency report finding Reczko

competent to proceed *pro se*.  *See* CR 608.[15]

Immediately thereafter, Bakman filed an *ex parte* application to be relieved,

and to permit Reczko to proceed *pro se*.  CR 602.  Bakman "advise[d] that he

---

[14] Bakman indeed subsequently embarked on this career.  *See* https://www.youtube.com/watch?v=IlOyo2rUacs.

[15]

[would] not serve as stand-by counsel [because] there exists an irreconcilable conflict with the defendant[.]" *Id.* at 2. He now praised Bassis, claiming she was "in a better position to act as [Reczko's] stand by counsel given she ha[d] prepared and written all pretrial motions" in the case. *Id.* ███████████████████

███████████████████████████

On September 9, the court held a *Faretta* hearing, and granted Reczko's request for self-representation. CR 626. The court relieved Bakman as Reczko's counsel, but noted it was considering appointing him as stand-by counsel, to which Bakman replied "I understand the court's dilemma, and with all due respect, that's not my problem." ER 69. Bakman declared he was "prepared to risk contempt and sanctions [] because [he would] not represent [that] man in any capacity, [nor would he] be present during any hearings, [nor] sit next to [that] man." *Id.*

The court noted that if it did appoint stand-by counsel, then that attorney would "have no official role and would not do anything with respect to the trial[,]" and that stand-by counsel was "literally that, to stand by in the event that there should be a determination by the court to revoke the *pro per* status of Mr. Reczko." ER 39, 86. The court took the issue of appointing stand-by counsel under submission. ER 88-89. Following that, Reczko (now acting as his own attorney) waived his right to conduct any Rule 15 depositions. ER 89-92. On that same

23

date, the court appointed David Kaloyanides as Reczko's stand-by counsel. CR 626.[16]

On October 17, the Government filed a Second Superseding Indictment, alleging one violation of 18 U.S.C. § 2251(c), production of child pornography with intent to transport or actual transportation to the United States (Count One). ER 131-33. As to Count One, the Government charged a sentencing enhancement

---

[16] Almost immediately, on September 24, Reczko moved to reinstate Rule 15 depositions. CR 640. On February 21, 2014, the court denied his motion, finding that Reczko waived his right to conduct Rule 15 depositions at the *Faretta* hearing. CR 720. On March 17, Reczko again moved to reinstate Rule 15 depositions, which the Government opposed. CR 734, 748. The court denied Reczko's motion. CR 795**.**

Reczko proceeded *pro se* from September 9, 2013, until the first day of trial, on February 17, 2015. The parties litigated various issues during Reczko's *pro se* tenure. Motions filed by Reczko were largely incomprehensible. The primary issues litigated concerned discovery productions by the Government and IJM. *See e.g.,* CR 628, 644, 646, 647, 657, 721, 736, 746, 750, 756, 760, 766, 779, 775, 781, 785, 798, 823, 841, 852, 885, 874. This litigation included privilege issues concerning disclosure of transcripts and videos of Del Rosario being interviewed by IJM social workers. CR 733, 761, 778, 775, 788, 792, 802, 828-29, 835, 844, 879-80.

Reczko omits discussion of the various other issues litigated during this time, such as his motion to dismiss the indictment on *Trombetta* grounds, CR 630, motion for appointment of a pre-trial detention expert, CR 710, motion to dismiss for outrageous government conduct, CR 838, and motion to suppress the "Baby Wow" CD, CR 853.

During this time, Reczko complained on several occasions about his inability to represent himself, requested assistance of counsel, *see* CR 923, and complained that his attorneys were slow in turning over his case materials. *See e.g.,* CR 633, 706.

under 18 U.S.C. § 3559(e), alleging that the offense occurred subsequent to Reczko's prior rape conviction involving a minor. *Id.* Count Two alleged a violation of 18 U.S.C. § 2260A, which charged that Reczko committed the offense while being required to register as a sex offender. *Id.*

Reczko continued to complain about his inability to represent himself. *See e.g.,* ER 322-25. The Government shared his concerns, and on August 22, 2014, it asked the court to address whether Reczko sought to withdraw his Sixth Amendment waiver of right to counsel. ER 123-29. In so doing, the Government noted that Reczko had "vociferously complained about the disadvantages of proceeding *pro se*, including that he was not given advisory counsel, [did] not have unfettered access to a law library . . . [and he could not] do his own legal research." ER 125. The Government also noted the importance of Reczko's observation that the court had "set [him] up for failure" by permitting him to self-represent. ER 126.

And Reczko continued to complain about his *pro se* status. For example, in a filing dated October 17, 2014, he complained that he was "ignorant of the law" and "ignorant of the Excludable Time Periods [in his case] and ha[d] no access to them." CR 938 at 2. Reczko also noted that his lengthy pretrial detention was why he moved to self-represent "despite his lack of competency to self-represent[,]" and further noted that he did not actually want to waive counsel but "only wanted

25

to have trial within a reasonable period of time." CR 938 at 2-3. Reczko also complained he was being denied access to the law library and computer at the jail, and that he was receiving the Government's filings late. CR 912, 915, 916, 921. He noted that his standby counsel was not communicating with him and requested the district court "appoint[] standby counsel for legal assistance." CR 921.[17]

On December 22, 2014 Reczko moved the court to revoke his *pro se* status and appoint his standby counsel, Kaloyanides, as his attorney. CR 977.[18] On January 4, 2015, Kaloyanides filed a declaration stating that pursuant to the court's order that he "not . . . insert himself in the defense preparation of the case but only to monitor the case and be prepared to step in to take over the case if the Court ordered that Mr. Reczko's pro se status was terminated[,]" he had "not been privy to any defense preparation for pretrial motions, motions in limine, experts witness analysis and preparation for testimony, and witness preparation as part of the defense case." CR 981 at 2. Kaloyanides further declared that he essentially had no involvement in the case and was not prepared to represent Reczko either at trial or the upcoming evidentiary hearing, and that his representation could not "comport with the requirements of the Sixth Amendment[.]" CR 981 at 3.

---

[17] Standby counsel had been specifically ordered not to participate in the defense in any manner. *See* ER 39-40, 65; *see also* CR 626, 981.

[18] Trial was then scheduled to commence February 17, 2015.

26

Kaloyanides concluded that he was willing to represent Reczko as lead counsel, but would need a continuance of the trial date in order for him to "provide effective representation under the Sixth Amendment."  CR 981 at 4.

Two days later, Reczko submitted another pleading stating he was "in no position to adequately and effectively represent himself."  CR 997 at 2. ▮

The court held an evidentiary hearing on Reczko's motions to suppress evidence and dismiss for outrageous government conduct on February 2, 2015.

Several government witnesses testified, but Reczko did not participate. CR 1136 at 7-8, 12-13, 16-17. On February 4, 2015, the court denied both motions. CR 1047.

On February 6, Reczko filed a declaration stating he "ha[d] no defense and [was] not prepared with one." CR 1057 at 2. He further declared that he had been placed in the Special Housing Unit ("SHU") from December 18 to December 23, 2014, with no access to a phone, email, or his case file. CR 1057 at 2. He further declared that he had various mental health issues, and was taking medication which made him "high three quarters of the day." CR 1057 at 3-4.

The court held a pretrial conference on February 9. CR 1180. At that hearing, Reczko complained that the court was "biased" and was "trying to railroad" him. CR 1180 at 7. A heated argument between Reczko and the court ensued; the court ordered standby counsel to be prepared for discussions on motions *in limine*. CR 1180 at 8-16. Another pretrial conference was held on February 13. CR 1204. At that conference, Reczko apologized to the court for his prior outburst and noted that he had been in the SHU the prior few days, and that he was unprepared to do anything "except to just be" there. CR 1204 at 5. Reczko confirmed that he did not file an opposition to the Government's motions *in limine*, that he was unprepared to proceed to trial, and that his medications, namely Lyrica, were making him high. CR 1204 at 7-9, 19-24.

28

The court then held a hearing where several medical professionals testified. Dr. Lisa Hope testified that Reczko did not suffer from a mental disease or defect that would render him unable to represent himself, but that he did have a personality disorder. CR 1204 at 16-18. Dr. Toh, a doctor who treated Reczko at the jail, testified that Lyrica could cause drowsiness and trouble concentrating. CR 1204 at 31, 33.[19] Dr. Awad, the jail's clinical director, testified that Reczko had never complained of memory lapses. *Id.* at 33-37. The court concluded that Reczko's complaints were not credible. *Id.* at 37-40.

## D. The district court's revocation of Reczko's *pro se* status, trial, and sentencing.

On February 16, 2015, the Government filed the trial indictment, alleging one count of production of child pornography in violation of 18 U.S.C. § 2251(c). ER 121.

Jury trial commenced the next day. Immediately before jury selection, Reczko suffered a mental breakdown in open court, and the court revoked his *pro se* status and appointed standby counsel, Kaloyanides, to represent him. CR 1175 at 24-29. The jury trial lasted four days, and ended in a guilty verdict on the sole count. CR 1092. On March 6, the court proceeded with a two-day bench trial on Count Two, the section 2260A charge, and found Reczko guilty on March 10. CR

---

[19] Side-effects of Lyrica include problems with concentration and "feeling high." *See* https://www.fda.gov/downloads/Drugs/DrugSafety/UCM152825.pdf.

1105.  On May 18, the court found that Reczko's prior conviction qualified as a "prior sex offense" involving a minor under section 3559(e), triggering a mandatory life term, *see* ER 11, and sentenced Reczko to life imprisonment plus ten years, consisting of life on Count One, and a 10-year consecutive sentence on Count Two.  ER 1**.**  Judgment entered on May 21, 2015, and Reczko timely appealed.  ER 1, 114.

**STATEMENT OF FACTS**

**A.     Overview.**

The gravamen of the Government's case was that Reczko maintained a relationship with Elecita Del Rosario between 2005 and 2007, and that in January 2006, the two entered into a "sham" marriage in the Philippines, when Del Rosario was 15.  The Government's case centered on a trip Reczko and Del Rosario took to Manila in November 2006.  The Government alleged that during that trip, Reczko took several photographs of himself and Del Rosario having sex, after which he then returned to the United States, burned those images onto a CD, and thereafter returned to the Philippines with that CD. [20]

---

[20] Throughout the pendency of this case, the parties referred to this CD as the "Baby Wow" CD because of its label.  For ease of reference, Reczko adopts that naming convention here.

30

The section 3559(e) sentencing enhancement, which triggered Reczko's mandatory life sentence, and Count Two, the section 2260A offense, were based on Reczko's 1996 conviction for violating New York Penal Law § 130.35(1).

**B.    Evidentiary hearing on the motion to suppress evidence.**

The facts elicited in relation to Reczko's motion to suppress evidence primarily concerned the investigation and arrest of Reczko in the Philippines through a joint effort between IJM, the Philippine police, and the United States Government.

On May 10, 2007, IJM International Director of Investigations Daryl Purviance directed IJM investigators Lisa Baldado and Mark Albo to interview Del Rosario, and retrieve evidence Del Rosario had given to Anecita Suico, a local social worker.  CR 1037 at 13-14.[21]  The following day, Purviance contacted the United States Embassy and spoke with United States Immigration and Customs Enforcement ("ICE") agent Julian Briola, and provided him information about the investigation.  *Id.*  Purviance requested assistance from ICE and offered the evidence IJM possessed.  *Id.* at 15.  IJM continued to investigate Reczko.  *Id.*

On May 24, S/A Briola interviewed Del Rosario, with IJM's assistance.  *Id.* at 16.  Purviance provided ICE with the evidence IJM had collected, and he

---

[21] As discussed below, Reczko came to the attention of Philippine authorities when Del Rosario reported him to the social welfare department for physical abuse.

31

continued to gather additional evidence; Purviance nevertheless declared that ICE was unaware of any continued investigation. *Id.* at 17.

On July 2, the Philippine National Police ("PNP"), with IJM's assistance, CR 1136 at 33, arrested Reczko, in Dumaguete, Philippines. *Id.* at 18. After PBI took custody of Reczko, while en route to Cebu City, the arresting officers went to Reczko's hotel room where IJM employees searched his luggage and recovered critical evidence in the case, including four memory cards and three CD's labeled "Averie Fall Halloween 2006," "Mulabuyuk," and "San Diego Zoo." *Id.* at 18-19.

In August 2007, ICE agent Dante Orate addressed with Purviance his concerns about joint action between ICE and IJM. *Id.* at 19-20. Nonetheless, for the next few months, IJM continued to obtain evidence from the Del Rosario family and provided it to ICE. *Id.* at 20.

On the joint action question, Purviance disclaimed knowledge about why the November 2, 2007 IJM press release declared that "IJM worked closely with Philippine and U.S. authorities to locate [Reczko] under the auspices of the PROTECT Act." CR 1136 at 21. Likewise, when presented with an August 8, 2007 letter from IJM to the PBI which confirmed that the United States Government asked the Philippines to deport Reczko, Purviance denied all knowledge of those events. *Id.* at 22-24. And while Purviance approved an IJM report that reflected IJM was being supported by ICE and the Philippine authorities

32

with respect to the Del Rosario case, he then denied that ICE was involved in his investigation. *Id.* at 26.[22] He further denied instructing Pueblos, an IJM social worker, to tell witnesses not to talk to Reczko's defense team, despite a narrative prepared by Pueblos which stated that Purviance had indeed so instructed her. *Id.* at 28-29.

Agent Briola declared that he knew IJM was investigating Reczko by May 11, 2007, and that Purviance then asked for ICE's assistance. CR 1037 at 5-6. But Briola denied instructing IJM to continue investigating the case. *Id.* Nevertheless, on May 23 and 24, Briola interviewed Del Rosario in the presence of IJM employees, and obtained all the evidence that IJM possessed. *Id.* at 7; CR 1136 at 45. Briola denied knowledge of IJM's August 8, 2007 letter to the PBI. *Id.* at 46.

ICE agent Orate assisted agent Briola's investigation during May 2007. CR 1037 at 23. Orate declared that he neither encouraged nor acquiesced to IJM's search of Reczko's property, nor its investigation into Reczko. *Id.* at 24. On August 2, IJM transferred all evidence it possessed to Orate, and Orate continued

---

[22] In contrast, Purviance claimed that when IJM located Reczko in Dumaguete, he did not inform United States authorities, and he was unaware that his boss was in contact with United States authorities at that time. *Id.* at 36. Purviance testified that the United States began investigating Reczko after his arrest. *Id.* at 40.

investigating Reczko with IJM's assistance; Orate nonetheless asserted that IJM's ongoing investigation was separate. *Id.* at 24-25.

Orate testified he interviewed Del Rosario at IJM's office, along with Philippine police officials, and IJM employee, Stella Pueblos, in August 2007. CR 1136 at 51-52. Orate denied ever instructing Pueblos to tell witnesses not to talk to the defense team, and denied directing her to collect evidence for the United States Government. *Id.* at 52-54.

IJM investigator Baldado testified about her May 24, 2007 report, where she wrote: "Investigations Team notified, gained the support of, and mobilized the U.S. Immigrations and Customs Enforcement, ICE, Manila, to act on behalf of victim." *Id.* at 58-60. She testified that she wrote the report at the direction of her boss, Purviance, that it was his language, and that she included it in the report because he instructed her to. *Id.* at 60.

The district court found no joint venture. CR 1047.

## C.    The Government's case at trial.

Reczko came to the attention of Philippine authorities on May 9, 2017, when Del Rosario and her mother approached social worker Suico and reported abuse allegations against him. CR 1175 at 205-207. Del Rosario was then 17. *Id.* at 207. Del Rosario also provided Suico with photographs of Del Rosario engaged in sex, and Suico contacted the police. *Id.* at 208-09. Afterward, Del Rosario, her

34

mother, a Cebu City police officer, and Suico visited the apartment that Reczko rented with Del Rosario. *Id.* at 209, 214. There, they recovered nude and sexual photographs of Del Rosario. *Id.* at 210. At the apartment, Del Rosario provided Suico with CDs, one of which was the "Baby Wow CD." *Id.* at 211-12. Suico then contacted IJM, and IJM investigator Albo retrieved the evidence the next day. *Id.* as 212-13.

IJM investigator Purviance testified that he became involved in Reczko's case the next day, May 10. *Id.* at 223. He testified that he obtained and placed in the IJM vault all of the evidence provided by Suico. *Id.* at 224. He also made a duplicate of the "Baby Wow" CD. *Id.* at 228. He eventually turned over the original "Baby Wow" CD to United States Homeland Security, and retained his copy. *Id.* at 232, CR 1176 at 11.

Purviance obtained evidence from Reczko's suitcase following his July 2 arrest, and prepared an evidence log of all the material recovered; his log did *not* include four memory cards and a CD that he later claimed were located during the search. *Id.* at 232-39; CR 1176 at 15-19.[23]

The Government's primary witness was Del Rosario. She testified that she was born on March 26, 1990, and grew up in Cebu City, in the Philippines. CR

---

[23] In addition to the four memory cards, IJM claimed it recovered three CD's, labeled "Averie Fall Halloween 2006," "Mulabuyuk," and "San Diego Zoo."

1176 at 63. She was 13 when she first spoke with Reczko over the phone. *Id.* at 70. When they first started talking on the phone, Reczko would send her money through western union for school projects. *Id.* at 71. Reczko sent this money on the condition that they both masturbate over the phone, which occurred three times. *Id.* at 71. Del Rosario first met Reczko in person when she was 15, in November 2005, when Reczko visited the Philippines. *Id.* at 72.

The two of them spent time together, and did things like go to the mall, and out to eat. *Id.* at 76. During the first visit, Del Rosario and Reczko talked about getting engaged. *Id.* at 78. Del Rosario testified that she told Reczko she was too young because she was 15, but Reczko let her keep an engagement ring he had given her. *Id.* at 78.

The next time Del Rosario and Reczko met was in January 2006. *Id.* at 79. One night in January 2006, Reczko, Del Rosario, and Del Rosario's mother and sister all went to a bar, and afterward, all slept at a hotel in Cebu City; that night Reczko touched Del Rosario's breasts and between her legs. *Id.* at 79-82.

Reczko and Del Rosario began dating, and Reczko subsequently moved in with Del Rosario and her parents. *Id.* at 83. Del Rosario told Reczko that she would have sex with him, but wanted to wait until December 2006 to do so. *Id.* at

86.[24]  On January 31, 2006, she and Reczko married in Cebu City; Del Rosario

testified she was 15 at the time.  *Id.* at 86.  Del Rosario testified that the judge who

married them informed them that the marriage would be legal when she turned 18.

*Id.* at 102.  At the time of the marriage, Del Rosario signed a document which

purported that she was of "legal age" to marry, even though she was not of legal

age.  CR 1177 at 30-35.[25]  Following their marriage, they continued their

relationship, during which they had sex, and eventually moved into an apartment

together.  CR 1176 at 87-91, 106-08.

Del Rosario testified, over defense objection, that before the wedding, her

uncle told her that she could not marry because she was a minor, and that Reczko

overheard that.  *Id.* at 94-98.  Del Rosario further claimed that on a separate

occasion, a social worker told her and Reczko that they could not marry because

she was a minor.  *Id.* at 100.

---

[24] It appears that Del Rosario testified incorrectly about several dates, with no correction by the Government.  Del Rosario testified that she first met Reczko in November 2005, *id.* at 72, and that she told him that she wanted to wait until December 2006 to have sex with him, *id.* at 86, but then subsequently testified that the actual date was December 2005, *id.* at 87.  She then testified that they married on January 31, 2006, *id.* at 86, and then subsequently testified that they actually married on "December 6, 2006—2005."  *Id.* at 87.

[25] The legal age of marriage in the Philippines is 18.  *See* Family Code of the Philippines, Ch. 3, Art. 35.  If one of the parties is between the ages of 18 and 21, the parties' parents must submit, in writing, their consent to the marriage.  *See id. at* Art. 14.  The age of consent, however, is 12.  *See* Philippines Republic Act No. 8353, Ch. 3, Art. 266.

37

Del Rosario testified that the photos on the "Baby Wow" CD were taken in November 2006, during a trip she and Reczko took together to Manila. *Id.* at 112. She further testified that after that trip, Reczko returned to the States with his computer and the photos. *Id.* at 123. Reczko returned to the Philippines in March 2007; around that time their relationship began to sour, and they began fighting a lot. *Id.* at 126. Del Rosario left Reczko in May 2007, but continued seeing him "on and off." CR 1177 at 22-24.

Department of Homeland Security Special Agent Olga Sagalovich searched Reczko's luggage upon his arrival and arrest in Los Angeles in September 2007. *Id.* at 59, 78-80. Sagalovich did not know who had access to Reczko's luggage while he was detained in the Philippines. *Id.* at 80.

Sagalovich also recovered a packet of documents with handwriting that appeared to be Reczko's. *Id.* at 72-73. The packet included a letter from Reczko to the United Nations Office of the High Commissioner for Human Rights. *Id.* at 73. In that letter, Reczko wrote out a chronology of events, which stated that he married a Filipina at the Cebu City courthouse on January 1, 2006. *Id.* at 75. He stayed with her family until March 2006 and then returned to Los Angeles. *Id.* In November 2006, he returned to the Philippines and furnished their new apartment. *Id.* He again returned to the Philippines in March 2007, and was arrested on July

38

2, 2007 by local authorities in Dumaguete and held until the Bureau of
Immigration picked him up. *Id.* at 76.

Richelle Reczko, Reczko's ex-wife, also testified for the Government. Ms.
Reczko testified that she and Reczko divorced in April 2008, and that in December
2006, he stayed with her and their daughter in their Los Angeles apartment. *Id.* at
103-04. Ms. Reczko discovered various letters in their apartment, written by
Reczko to Del Rosario, which she subsequently provided to Agent Sagalovich. *Id.*
at 109-13. Ms. Reczko identified several photographs which she explained were
taken in the months of October and December 2006—these photographs depicted
Reczko at a friend's house in Los Angeles during the 2006 holidays, and
photographs of Reczko with their daughter in their apartment. *Id.* at 104-08.

Bruce Pixley testified for the Government as an expert in computer
forensics. *Id.* at 129. Pixley conducted forensic examinations of the digital media
in this case, including the "Baby Wow" CD, as well as the four memory cards and
other CD's recovered from Reczko on the date of his arrest in the Philippines. *Id.*
at 130-32. When Pixley initially received the "Baby Wow" CD, it was damaged
by a ballpoint pen, but he was nonetheless able to recover data from the disc. *Id.* at
139-40. Some images from the disc could not be retrieved, however, and some
could only be partially retrieved. *Id.* at 143. Pixley also conducted a forensic

39

examination of a CD labeled "IJM CD" which was a copy of the "Baby Wow" CD, but with the data intact. *Id.* at 144-49.

Pixley testified about the metadata, *viz.*, the date and time stamps embedded in the images on the media, and that based on that data he determined that the images on the "Baby Wow" CD were taken on various dates throughout November 2006. *Id.* at 153-62. Pixley testified that the images on the "Baby Wow" CD were burned on December 25, 2006, at 11:28 a.m. *Id.* at 168-70.

In short, the Government used Pixley's testimony to assert that Reczko took the photographs on the "Baby Wow" CD in the Philippines in November 2006, and then burned them onto a CD while in Los Angeles in December 2006.

## D.     Reczko's defense.

Reczko did not present any witnesses at trial, and his attorney waived the "mistake of age" defense that Reczko and his defense team had previously pursued. *See* CR 1176 at 94-95. In closing, his defense counsel argued that the Government failed to prove that Reczko intended to transport the images on the "Baby Wow" CD to the United States, or that he knowingly did. CR 1178 at 34, 42. Specifically, the defense argued that the metadata came from the camera that captured the images at issue, and that there was no proof that the camera was calibrated properly, *viz.*, that the date and time stamps in those images were the

40

actual dates and times when the images were taken, and that there was insufficient proof that Reczko burned the CD's in the States. *Id.* at 33-37, 43-44.

**E.     The bench trial on the section 2260A charge and judicial findings on the section 3559(e) sentencing enhancement.**

The parties stipulated to the admission of various documents relating to Reczko's 1996 New York conviction, which showed that Reczko was previously convicted pursuant to guilty plea of New York State Penal Law section 130.35(1), Rape in the First Degree, for having sex with his 14 year old daughter.

Peter Miranda, an officer with the Los Angeles Police Department, testified that he was the officer who registered Reczko, for his prior sex-related conviction, in California after Reczko relocated from New York. CR 1181 at 14-21. The district court found Reczko guilty on Count Two. CR 1182 at 19. The district court found that Reczko's prior conviction qualified as a prior sex offense involving a minor under section 3559(e). ER 11.

## SUMMARY OF THE ARGUMENT

Reczko brings seven claims of relief. Based on those errors, Reczko also assigns cumulative error.

Reczko first argues the district court constructively denied his Sixth Amendment right to counsel by denying his numerous motions for substitute counsel, and by permitting him to be represented—for almost six years—by two

41

attorneys with whom he had an irreconcilable conflict, who had conflicts amongst themselves, and who on several occasions sought to be removed from his case. Reczko requested substitute counsel at least 10 times during the pendency of his case. Attorney Bakman sought to be removed five times, Bassis requested the same for herself on four occasions, and Bakman sought Bassis's removal twice. On these facts alone, the district court should have appointed Reczko new counsel, and its failure to do constructively denied Reczko's right to counsel.

Reczko also argues that his right to counsel was further violated when the district court refused to reappoint counsel after Reczko went *pro se*. Reczko made numerous requests for an attorney after he realized he could not effectively represent himself because of his custody status, and the complexity of the case. While a defendant's right to counsel is no longer absolute after they waive it, such a waiver is not cast in stone. *Menefield v. Borg*, 881 F.2d 696, 700 (9th Cir. 1989). This Court recognizes that subsequent events may nullify a defendant's waiver of right to counsel. Reczko realized not long after going *pro se* that he was in over his head. His requests for counsel were timely, and the district court should have reappointed an attorney.

Third, Reczko argues that his jury waiver as to the section 3559(e) sentencing enhancement—which triggered the mandatory life term in this case— and the section 2260A charge was invalid. The district court failed to follow the

42

requirements of Federal Rule of Criminal Procedure 23(a) and obtain the waiver in writing. In so doing, the court failed to conduct a full colloquy and advise Reczko as required by *United States v. Cochran*, 770 F.2d 850 (9th Cir. 1985). Reczko's jury waiver was invalid for this and additional reasons.

Fourth, the district court erred when it found that Reczko's 1996 conviction under N.Y. Pen. L. § 130.35(1) qualified as a predicate under 18 U.S.C. § 3559(e). Specifically, the district court incorrectly found the New York statute was a categorical match to 18 U.S.C. § 2241(a), but the New York statute is categorically overbroad and does not therefore qualify as a predicate under 18 U.S.C. § 3559(e).

And the district court also erred when it instructed the jury on the section 2251(c) offense. Pursuant to that statute, Reczko was charged with "knowingly employ[ing], us[ing], persuad[ing], induc[ing], entic[ing], and coerc[ing] Elecita Del Rosario, then a 16-year old minor girl, to engage in sexually explicit conduct . . . in the Philippines, for the purpose of producing a visual depiction of such conduct, and [that he] intended such visual depiction to be transported to the United States, and did transport such visual depiction to the United States[.]" Properly construed, *see Burrage v. United States*, 134 S. Ct. 881 (2014), the Government was required to prove that Reczko would not have engaged in the sexually illicit conduct with Del Rosario *but for* his desire to produce the images at issue. The district court failed to instruct on the motive element. Similarly,

43

because the Government was required to prove that the sexual conduct at issue would not have occurred but for Reczko's desire to produce the images, it failed to present sufficient evidence to obtain conviction.

The district court further erred when it denied Reczko's motions to depose foreign witnesses under Federal Rule of Criminal Procedure 15. Reczko proffered that two of these witnesses—Judge Gil Acosta and Mary Lou Cabanas—could provide critical exculpatory testimony to support his "mistake of age" defense. The district court abused its discretion by forgoing the "exceptional circumstances" standard under Rule 15.

Reczko's last substantive claim is that his mandatory life sentence under section 3559(e) violates the Eighth Amendment. Applying the "as-applied" challenge set forth by the Supreme Court, he argues that his sentence is disproportionate to his offense. And this is made all the more salient when compared to other federal sex cases presenting facts far more egregious than his, where defendants received much lesser sentences.

44

## ARGUMENT

**A.    The district court violated Reczko's Sixth Amendment rights by constructively denying him his right to counsel.**

### 1.    Introduction and standard of review.

"[T]he right to counsel is among the most fundamental rights of [the] criminal justice system." *Menefield*, 881 F.2d at 698.  This Court reviews whether a defendant was denied his Sixth Amendment right to counsel *de novo*.  *United States v. Hantzis*, 625 F.3d 575, 582 (9th Cir. 2010).  It reviews a district court's denial of a motion to substitute counsel for abuse of discretion.  *United States v. Velazquez*, 855 F.3d 1021, 1034 (9th Cir. 2017).  "To evaluate whether a district court abused its discretion in denying a motion to substitute counsel, [the Court must] consider three factors: (1) the adequacy of the district court's inquiry; (2) the extent of the conflict between the defendant and counsel; and (3) the timeliness of the defendant's motion." *Id.* (internal quotations and citations omitted).

### 2.    The district court constructively denied Reczko his Sixth Amendment right to counsel by denying his numerous motions for substitute counsel, and permitting his attorneys, with whom he had an irreconcilable conflict, to represent him for a period of almost six years.

"Where a criminal defendant has, with legitimate reason, completely lost trust in his attorney, and the trial court refuses to remove the attorney, the defendant is constructively denied counsel." *Id.* at 1033-34 (internal citations

45

omitted).  Indeed, "to compel one charged with grievous crime to undergo a trial with the assistance of an attorney with whom he has become embroiled in irreconcilable conflict is to deprive him of the effective assistance of any counsel whatsoever."  *Brown v. Craven*, 424 F.2d 1166, 1170 (9th Cir. 1970).  "A defendant need not show prejudice when the breakdown of a relationship between attorney and client from irreconcilable differences results in the complete denial of counsel."  *Id.* (internal citations omitted); *see also Ellis v. Harrison*, USCA Case No. 16-56188 at *7 (9th Cir. 2018).

When the erroneous denial of a motion to substitute counsel prompts a defendant to choose self-representation, reversal of the conviction is warranted, despite the defendant's "choice" to self-represent.  *United States v. Williams*, 594 F.2d 1258 (9th Cir. 1979).

### a.  The record demonstrates that Reczko effectively proceeded without the assistance of counsel.

The record below clearly demonstrates there existed—for years—a long-standing irreconcilable conflict between Reczko and his attorneys, and amongst the attorneys.  Reczko requested substitute counsel at least 10 times during Bakman's and Bassis's representation.  *See* ER 584, 703, 756-59, 826, 829, 838, 884; CR 346, 360, 390 at 4-8, 392.  Bakman requested to be relieved five times.  ER 345, 432, 843, 888; CR 1206 at 5-7.  Bassis requested to be removed four times, *see* ER

46

336, 352, 385, 806; and Bakman requested her removal twice.  ER 401, 727.  The

district court either ignored or denied all of these requests, and instead forced

Reczko to proceed with conflicted counsel for nearly six years, ultimately leaving

him no choice but to opt for self-representation.  In so doing, the district court

abused its discretion, and constructively denied Reczko his Sixth Amendment right

to counsel.

As an initial matter, the record shows that Reczko, during certain periods,

was effectively proceeding without the assistance of counsel whatsoever.  ███

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████████  Bakman declared that he

would risk sanctions, including being held in contempt, if the court required him to

continue his representation.  ER 69.  ██████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████████████████████

█████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████.[26]

---

[26] This approach constituted misconduct.  *See* California Rule of Professional
Conduct 3-100.  Bakman could not *sua sponte* determine that Reczko's accusations



■■■.  Bakman eventually admitted that Bassis had prepared all of the pretrial

motions.  CR 602 at 2.

On these facts alone, this Court should find that Reczko was denied his Sixth

Amendment right to counsel, vacate his convictions, and remand for new trial.  In

any event, application of the three *Velasquez* factors supports Reczko, and requires

reversal of his convictions.

> **b.**  ***Velasquez* establishes that the district court abused its discretion by denying Reczko's motions for substitute counsel.**

Reczko moved for substitute counsel on at least 10 occasions while being

represented by Bakman and Bassis:

---

against him constituted a waiver of the attorney-client privilege, ■■■■■■■

■■■■■■■■■■■       *See Bittaker v. Woodford*, 331 F.3d 715 (9th Cir. 2003).

On April 21, 2009, Reczko made his first motion for substitute counsel. ER 884. On May 21, 2009, Bakman informed the court that Reczko wanted to withdraw his motion. CR 1193 at 6-9.

On June 29 and July 21, 2009, Reczko moved for substitute counsel. ER 829, 838. Reczko reiterated his request at a hearing on July 27, and the district court did not entertain the motion, citing it first had to make a determination regarding his competency. CR 1194 at 13-14. After a competency report concluded Reczko competent for trial, but incompetent for self-representation, Bakman informed the court that Reczko wanted to stay with his current defense team. CR 1195 at 9.

On July 15, 2010, Reczko again moved to relieve his attorneys. ER 826. ██

████████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██

    ███████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████

49

███████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████ It appears the district court

never ruled on Reczko's October 24 motion.

On December 27, 2011, Reczko again moved for substitute counsel, arguing that he was not being given access to discovery, and that his attorneys would not visit him. CR 346. Reczko reiterated his request at a hearing held on January 18, 2012. CR 390 at 4-8. On February 15, 2012, Reczko again moved for a new attorney. CR 360. The district court denied Reczko's motions. ER 109.

On June 7, 2012, Reczko again moved for new counsel. CR 392. █████████

███████████████████████████████████████████████

██████████████████

On August 23, 2012, Reczko again requested substitute counsel. ER 584.

███████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

50

███████████████████████████████ The court still refused to appoint new

counsel.

On July 23, 2013, a new competency report suddenly and without

explanation asserted Reczko was competent to represent himself, and the court

permitted Reczko to represent himself beginning on September 9, 2013.

*Velasquez* establishes that the district court abused its discretion and

constructively denied Reczko his right to counsel.

Under the first *Velasquez* factor, the district court should, when "informed of

a conflict between trial counsel and a defendant . . . question the attorney or

defendant privately and in depth, and examine available witnesses." *Velasquez*,

855 F.3d at 1034 (internal quotations, brackets, and citations omitted). The first

*Velasquez* factor weighs in favor of Reczko. Despite Reczko's numerous requests

for substitute counsel, not once did the district court examine him or his attorneys

in private. At other times, the district court ignored or refused to entertain his

motions and held no hearing on them at all. And at other times, the court simply

failed to construe Reczko's complaints about his attorneys as requests for

substitute counsel, when it clearly should have.

But where the district court's error is most clear is under the second and

third *Velasquez* factors. As to the second factor, the Court "ask[s] whether there

was a serious breach of trust and a significant breakdown in communication that

51

substantially interfered with the attorney-client relationship." *Id.* at 1035-36 (internal quotations and citations omitted). Here, there can be no question that there was. Indeed, this record is "replete with evidence of a dysfunctional attorney-client relationship." *Id.* at 1036. And while the district court justified its denials of Reczko's requests by attributing the chaos primarily to him, the record reflects Bakman's and Bassis's independent conflicts and contributions to the *bona fide* breakdowns of these relationships. ████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

And Bakman made plain his utter contempt for his client, and his refusal to work to assist his client, even in the face of sanctions against him. ER 69. ██████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

Indeed, the conduct of both attorneys was so questionable that it resulted in multiple admonishments from the court; at one point, the court even threatened to incarcerate them. CR 409.

The third *Velasquez* factor requires the Court to evaluate the timeliness of Reczko's request and "balance[] the resulting inconvenience and delay against the

52

defendant's important constitutional right." *Velasquez*, 855 F.3d at 1036-37 (internal quotations, brackets, and citations omitted). The third factor also weighs in Reczko's favor. Reczko made his first request for substitute counsel on April 21, 2009, approximately a year-and-a-half following Bakman's appointment. Bakman made his first request to be removed from the case only a few weeks later on May 13, 2009.[27] And while, according to Bakman, Reczko sought to withdraw that request, approximately one year later, he made an unequivocal motion for substitute counsel on July 15, 2010, which the district court denied on August 17, 2010—four and-a-half years before trial.

Reczko continuously requested substitute counsel, through and until 2013, until the court granted his *Faretta* motion. His requests were timely, especially considering that trial did not begin until February 2015. In short, "[a]lthough this was a complex case with voluminous discovery that might have required a continuance if new counsel were appointed, [Reczko] [made his] motions promptly." *Id.* at 1037.

### c. This Court's earlier cases also demonstrate that the district court constructively denied Reczko his right to counsel.

The facts in *Velasquez* which established a constructive denial of counsel are far less egregious than this case. There, the defendant filed a *pro se* motion to have

---

[27] Trial did not commence for another five and-a-half years.

her attorney substituted, arguing that her attorney would not communicate with her and was inattentive. *Id.* at 1025. At a hearing on the motion, the defendant complained that her attorney was not communicating with her, that he did not meet with her to discuss her plea agreement, and that he had lied to the court. *Id.* at 1025-26. The court denied the motion, and at a subsequent hearing, the defendant again addressed the judge and alleged her lawyer was ineffective, and that they were "at great odds[.]" *Id.* at 1026. Not long thereafter, the defendant again moved for substitute counsel, and alleged several failures on her attorney's part, including a failure to investigate, failure to give her access to discovery, and failure to communicate. *Id.*

The defendant's attorney informed the court that he was unable to have a productive meeting with the defendant. *Id.* The two of them exchanged accusations in open court, and her attorney alleged that she was surreptitiously recording their conversations to use against him in court. *Id.* at 1027. The attorney informed the court he refused to meet with the defendant because she was "yelling at [him]." *Id.* at 1028. The defendant further questioned whether her attorney would zealously represent her. *Id.* at 1029.

Despite this obvious conflict, the district court again denied the defendant's motion. *Id.* at 1033. The defendant then entered a guilty plea with her attorney. *Id.* On these facts, this Court found that the district court abused its discretion in

54

denying the defendant's motions for substitute counsel, resulting in a "constructive denial of counsel that require[d]" vacatur of the defendant's guilty plea. *Id.* at 1037.

In *Williams*, 594 F.2d at 1259, the defendant moved—approximately one month before his trial—for new counsel, "stating as grounds for the motion that he and the counsel were totally incompatible so far as preparation for trial was concerned." This Court noted it was "clear from the transcript that client and attorney were at serious odds and had been for some time" and that the contentions made by the appellant about the conflict between him and his attorney were not disputed. *Id.* at 1260-61. Yet, the trial court denied the defendant's motion. *Id.*

One month later, and a week before trial, the defendant renewed his motion, again citing "disagreement, [a] bad relationship, and [a] lack of communication" between him and his attorney—the attorney effectively confirmed those claims. *Id.* at 1260. The "[a]ppellant, faced with a choice of going to trial with [his attorney], or representing himself, chose the latter alternative. As might be anticipated, the defense was a disaster." *Id.* This Court found the denial of the appellant's motion for substitute counsel was error resulting in the "depriv[ation] of his constitutionally guaranteed right to have the effective assistance of counsel at trial." *Id.* at 1261.

In *Brown*, 424 F.2d at 1169, the defendant, charged in State court with murder, was represented by a public defender. The defendant made four motions for substitute counsel, and the "state court summarily denied the motions, making no adequate inquiry into the cause of [the defendant's] dissatisfaction with his counsel or taking any other steps which might possibly lead to the appointment of substitute counsel in whom [the defendant] could repose his confidence." *Id.* The defendant proceeded to trial with an attorney with whom he would not communicate, and was convicted of murder. *Id.* This Court reversed the judgment, finding "the state court did not [] take the necessary time and conduct such necessary inquiry as might have eased [the defendant's] dissatisfaction, distrust, and concern." *Id.* at 1170.

The extent of the conflict between Reczko and his attorneys was glaringly more severe than those in *Velasquez, Williams*, and *Brown*. These cases show that Reczko was constructively denied his right to counsel. Reczko need not establish prejudice, *see id.* at 1166, however, the prejudice is clear.[28]

---

[28] Most notable, of course, is the fact that Reczko was forced to go *pro se*, and proceed on a long and disastrous tenure as his own counsel, which ultimately resulted in his being represented by a self-proclaimed unprepared attorney, who was appointed on the first day of trial.

And the prejudice that arose from Reczko's lack of counsel during the evidentiary hearing on his motion to suppress evidence on Fourth Amendment grounds is clear as well. Reczko presented a meritorious motion; while the

In sum, the district court constructively denied Reczko counsel in violation of the Sixth Amendment. This Court should vacate Reczko's convictions and remand for new trial. *See Williams*, 594 F.2d 1258; *see also, Bradley v. Henry*, 510 F.3d 1093, 1104 (9th Cir. 2007); *Campbell v. Rice*, 408 F.3d 1166, 1172 (9th Cir. 2005) (*en banc*); *United States v. Yamashiro*, 788 F.3d 1231 (9th Cir. 2015).

---

Government sought to cast its agents as mere bystanders to an investigation conducted by IJM agents, or oblivious to the investigations of IJM and the Philippine government, the record, at a minimum, established some collusion between the agencies. And Reczko's case was not the only one in which the Government presented a defense of so-called "parallel investigations" against accusations of joint venture searches and seizures in the context of an international sex tourism prosecution. *See e.g., United States v. Pepe*, USCA No. 14-50095, Appellant's Excerpts of Record at 61 (United States Government agent claiming that his investigation was parallel to that of the Cambodian government's, despite evidence otherwise).

But Reczko, forced to proceed without counsel, did not cross-examine any of the witnesses at the evidentiary hearing. Despite there being evidence of collusion, and the presence of material that impeached the Government's account, *see e.g.,* CR 1037 at 19, CR 1136 at 2-24, 45-46, 52-54, 58-60, Reczko failed to develop his claim.

And this motion was critical; the evidence collected from Reczko during his arrest was crucial to the trial conviction.

**B.** **Reczko's Sixth Amendment rights were further violated by the district court's denial of his requests for reappointment of counsel after he went *pro se*.**

### 1. Introduction and standard of review.

"Whether a defendant was denied his Sixth Amendment right to counsel during a proceeding is a question of law to be reviewed de novo." *Hantzis*, 625 F.3d at 582. The denial of a defendant's Sixth Amendment right to counsel constitutes structural error, not subject to harmless error review. *See Williams*, 594 F.2d 1258; *Bradley*, 510 F.3d at 1104; *Campbell*, 408 F.3d at 1172; *Yamashiro*, 788 F.3d 1231.

"A properly conducted *Faretta* colloquy need not be renewed in subsequent proceedings unless intervening events substantially change the circumstances existing at the time of the initial colloquy." *Hantzis*, 625 F.3d at 580-81. "A competent election by the defendant to represent himself and to decline the assistance of counsel once made before the court carries forward through all further proceedings in that case *unless appointment of counsel for subsequent proceedings is expressly requested by the defendant*[.]" *Id.* at 581 (quoting *United States v. Springer*, 51 F.3d 861, 864-65 (9th Cir. 1995) (emphasis added). "The essential inquiry is whether circumstances have sufficiently changed since the date of the *Faretta* inquiry that the defendant can no longer be considered to have knowingly and intelligently waived the right to counsel." *Id.*

58

While the right to counsel is no longer absolute after a defendant waives it, a trial court nonetheless has a "duty to protect defendants' right to counsel[,]" and must therefore "indulg[e] all reasonable inferences against a waiver of counsel." *McCormick v. Adams*, 621 F.3d 970, 978-79 (9th Cir. 2010). Thus, a defendant's waiver of counsel may be "nullified by subsequent events." *Id.* at 978.

Moreover, while a party's request for a continuance is within the discretion of the trial judge, the Supreme Court has "cautioned that a myopic insistence upon expeditiousness in the face of a justifiable request for delay can render the right to defend with counsel an empty formality[.]" *Id*. at 980 (internal quotations omitted).

"When a decision to grant or deny a continuance implicates a defendant's Sixth Amendment right to counsel, a court must balance several factors to determine if the denial was fair and reasonable." *United States v. Thompson*, 587 F.3d 1165, 1174 (9th Cir. 2009) (internal quotations and citations omitted). "The district court's denial of [Reczko's] request can be analyzed as either as a denial of a continuance or as a denial of a motion to substitute counsel." *Id.* at 1173 (internal citations omitted). "A district court's primary reasons for not allowing a defendant new counsel may determine which analysis to apply." *Id.* (internal brackets, quotations, and citations omitted).

59

The several factors to be considered to determine whether the denial of a request for continuance that implicated the Sixth Amendment was fair and reasonable are: (1) whether the continuance would inconvenience witnesses, the court, counsel, or the parties; (2) whether other continuances have been granted; (3) whether legitimate reasons exist for the delay; (4) whether the delay is the defendant's fault; and (5) whether a denial would prejudice the defendant. *Id.* at 1174.

"Because the right to counsel is so central to our concepts of fair adjudication, [this Court is] reluctant to deny the practical fulfillment of the right—even once waived—absent a compelling reason that will survive constitutional scrutiny." *Menefield*, 881 F.2d at 700. A "defendant's initial decision to exercise his *Faretta* right and represent himself at trial is [not] a choice cast in stone." *Id*.

After having his numerous requests for substitute counsel denied, left with no choice, Reczko elected to represent himself. Despite a previous competency evaluation finding Reczko incompetent to represent himself, and with no exploration of how and why that critical determination changed, the district court granted his *Faretta* motion on September 9, 2013.

60

**2. The district court should have construed Reczko's complaints about his inability to represent himself and requests for advisory counsel as revocations of his waiver of counsel, and reappointed counsel, or at a minimum, held a hearing to inquire whether Reczko wished to continue waiving his right to counsel.**

Not long after being granted *pro se* status, Reczko began complaining of his inability to represent himself. *See e.g.,* CR 706, 853, 874, 912, 938, 915-16, 921, 923. His complaints included the court's refusal to appoint advisory counsel to assist him, CR 853, being on lockdown at the jail, and having his access to the law library, and computer restricted, CR 912. On July 31, 2014, Reczko requested a replacement paralegal, specifically one who could "research law" and write motions. ER 322-25. On October 6, 2014, he filed a motion objecting to the court's "punitive order to permit him to go Pro Se but not permit him any advisory counsel[.]" CR 923.

Despite Reczko's complaints and requests, the district court did not hold a hearing to inquire whether Reczko was revoking his waiver of counsel. But the district court, pursuant to its "duty to protect [Reczko's] right to counsel[,]" *McCormick*, 621 F.3d at 78-79, was required to do so, and its failure constitutes error. *See also Hantzis*, 625 F.3d at 580-81. Indeed, the district court refused to do so even after the Government requested it hold such a hearing, noting: "[g]iven Reczko's complaints, the government respectfully requests the Court inquire

61

whether the defendant wishes to revoke his waiver of his right to counsel and have counsel appointed for him." ER 123-30.

Importantly, Reczko's requests for counsel were far from the trial date, and given a fundamental constitutional right was at issue in this case that carried a potential life-term, the district court should have construed these statements for what they were: requests for reappointment of counsel. Accordingly, the district court should have reappointed counsel. Reczko's requests were timely and would have prevailed under the five factors put forth by this Court in *Thompson*.

### 3. In any event, the district court should have granted Reczko's unequivocal request for counsel made in December 2014, and appointed Kaloyanides, who had been standby counsel since September 2013, as his attorney.

Reczko unequivocally requested counsel in December 2014. CR 977. The district court then inquired with standby counsel, Kaloyanides, whether he would be prepared to try the case as it was currently scheduled, CR 978, and Kaloyanides responded he would not. CR 981. The district court then, almost one month after Reczko's formal request, construed his motion as one for a continuance, and denied it. ER 286-93. This was error. *See Williams*, 594 F.2d at 59-61 (finding that the trial court's failure to appoint counsel when the defendant requested it twice—one month and one week, respectively—before trial, was error).

62

But circumstances had changed significantly from the time Reczko requested—and was permitted—to proceed *pro se*, warranting reappointment of counsel.[29] Namely, Reczko had unequivocally changed his mind as to self-representation, and now requested reinstatement of counsel. Moreover, the Government had filed a second superseding indictment after he went *pro se*. ER 131-33. And, various discovery motions were litigated in the interim, changing the general posture of the case. Reczko had communicated his inability to represent himself effectively by virtue of his lack of resources while in jail and his frequent isolation without his materials, and had come to terms with the fact that the complexity of his case was beyond his ability to grasp. He admitted to the court he had no defense for trial, and refused to participate in his evidentiary proceeding, the outcome of which, was critical. He also complained about the side-effects of the medications he was prescribed in the jail.

These events "nullified" his earlier waiver of counsel. *McCormick*, 621 F.3d at 978. In short, the court should have reappointed counsel, namely, Kaloyanides, who was standby counsel at that point, following Reczko's unequivocal request.

And application of the five *Thompson* factors further establishes error.

---

[29] Still, Reczko maintains that his "choice" to represent himself was hardly a choice at all, given the circumstances with Bakman and Bassis.

*First*, while a continuance at the time of Reczko's December 2014 request may have inconvenienced witnesses, the court, or the parties, any inconvenience was minimal when viewed in light of the extraordinary consequence that flowed from the court's denial: a defendant, who had informed the court he was incapable of representing himself, having to try his own case before a jury, in a criminal case that carried a potential mandatory life sentence. At that point, the case had been pending for seven years; an additional continuance of a few months so that capable counsel could prepare to try the case would have hardly been of any consequence given the extensive delay that the case had already undergone, and the greatest prejudice would have been to Reczko. And, of course, the court could have appointed Kaloyanides *and* maintained the trial date in any event.

*Second*, other continuances had previously been granted; indeed, the case was in its seventh year at that point. But Reczko contends this factor too weighs in his favor, as not all of the continuances are solely attributed to him—many continuances were based on competency evaluations requested by Reczko's attorneys, his attorneys' failures to comply with court ordered deadlines for filing motions, and Government requests for continuances so that it could comply with discovery productions.

*Third*, legitimate reasons existed for the delay: to ensure that Reczko, who faced a mandatory life term, would gain benefit from a fundamental constitutional

64

right to which he was entitled and be represented by counsel at jury trial. So too, Reczko had long presented facts that supported reappointment of counsel, so much so, the Government (on August 22, 2014) asked the Court to make inquiries and address this issue. ER 123-30.

*Fourth*, as noted above with respect to the second factor, the delay was not Reczko's fault.

*Fifth*, the court's denial would prejudice Reczko, as it would force him to represent himself before a jury in a case that carried a potential life penalty.

In sum, the district court erred by failing to reappoint counsel following Reczko's requests during his *pro se* tenure. This resulted in a denial of counsel, and this Court should vacate Reczko's convictions and remand for new trial.

## C.  Reczko's jury waiver as to the section 3559(e) sentencing enhancement—which triggered the mandatory life sentence in this case—and the section 2260A charge was unconstitutionally inadequate, requiring reversal.

This Court reviews the adequacy of Reczko's waiver of his right to a jury trial on Count One's sentencing enhancement and Count Two *de novo*. *United States v. Laney*, 881 F.3d 1100, 1106 (9th Cir. 2018). An invalid jury waiver constitutes structural error, requiring reversal. *Id.* at 1108.

"A criminal defendant's right to a jury trial is fundamental." *Cochran*, 770 F.2d at 851. While a defendant may waive that right, "[t]o be valid, [the] waiver . .

65

. must be voluntary, knowing, and intelligent." *Laney*, 881 F.3d at 1106 (citing *United States v. Christensen*, 18 F.3d 822, 824 (9th Cir. 1994). Federal Rule of Criminal Procedure 23(a) requires that the waiver be in writing, that the Government consent to the waiver, and that the district court approve it. Fed. R. Cr. P. 23(a); *Laney*, 881 F.3d at 1107.

Notwithstanding the Rule 23 requirements, this Court permits oral jury waivers, but only "where the record clearly reflects that the defendant personally gave express consent in open court, intelligently and knowingly[.]" *Laney*, 881 F.3d at 1107 (internal quotations, italics, and citations omitted). Assertions by the Government that the defendant made a "tactical choice" to waive jury provides no insight into whether a defendant actually understood what they would be giving up by their waiver. *United States v. Shorty*, 741 F.3d 961, 969 (9th Cir. 2013). While a written waiver carries a "presumption that the waiver was voluntary, knowing, and intelligent[,]" *Laney*, 881 F.3d at 1106 (internal citations and brackets omitted), no such presumption applies in the case of oral jury waivers. *Shorty*, 741 F.3d at 966. Put simply, this Court scrutinizes oral waivers more than those in writing. *Id.* at 967. This Court must "indulge every reasonable presumption against waiver of fundamental constitutional rights[.]" *Laney*, 881 F.3d at 1107 (internal citations omitted).

66

Before accepting a defendant's waiver of their jury right, a court must conduct an in-depth colloquy with the defendant, and "must ensure that [the defendant] know what the right guarantees." *United States v. Tamman*, 782 F.3d 543, 551 (9th Cir. 2015). In *Cochran*, 770 F.2d at 853, this Court enumerated the four facts that the district court must advise the defendant of before accepting a jury waiver: that (1) 12 members of the community compose a jury; (2) the defendant may take part in jury selection; (3) jury verdicts must be unanimous; and (4) the court alone decides guilt or innocence if the defendant waives a jury trial.

If the defendant's mental or emotional state is at issue, then the court must conduct a fuller inquiry than otherwise required. *Christensen*, 18 F.3d at 825. Importantly, if a defendant is emotionally or mentally unstable, the court's failure to instruct on the four *Cochran* facts requires reversal. *Shorty*, 741 F.3d at 966. The suspected presence of a defendant's mental or emotional stability further eliminates any presumption that their waiver was voluntary, knowing, or intelligent. *See Christensen*, 18 F.3d at 826.

As an initial matter, Reczko's jury waiver was not in writing, and this Court therefore "proceed[s] without any presumption that it was[]" knowing and

67

intelligent.  *Shorty*, 741 F.3d at 966.[30]  Furthermore, there can be no dispute that Reczko's mental and emotional stability was a substantial issue at the time the district court took his waiver.

Moreover, the period during which the court accepted Reczko's waiver was a particularly tumultuous one: by that point, ███████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████  This conduct resulted in public admonishments by the district court, including threats of sanctions and imprisonment.  CR 409.  Bakman had—only weeks before the court took Reczko's waiver—███████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████

These facts establish that Reczko's obvious mental and emotional instability *required* the district court advise him of the four *Cochran* factors, which it failed to do.[31]

---

[30] Reczko was entitled to a jury trial on both the section 3559(e) sentencing enhancement, which triggered his mandatory life term, and the substantive section 2260A offense.  *See United States v. Doss,* 630 F.3d 1181, 1197 (9th Cir. 2011).

68

Of the four *Cochran* facts, the court only advised Reczko of the fourth: that if he waived jury, the court alone would decide his guilt or innocence. ER 104-07. The court did not, however, advise Reczko that his jury would be composed of 12 members of the community, that he could participate in jury selection, and that a jury verdict would have to be unanimous.[32]

This Court's opinion in *Shorty* is instructive. There, the district court accepted an oral jury waiver from a defendant who suffered from a learning disability, and instructed the defendant on only two of the four *Cochran* factors. 741 F.3d at 966-68. This Court found that "the district court did not fulfill its serious and weighty responsibility of ensuring that [the] waiver was knowing and

---

[31] Bakman's representation to the court that he had discussed the waiver with Reczko and that Reczko was on board, *see* ER 101, does not change this error. Moreover, an assertion by the Government that this was a tactical choice, *viz.,* a strategic effort by Reczko to keep his prior conviction away from the jury, is likewise of no consequence. *Shorty*, 741 F.3d at 969.

[32] This error is compounded by the fact that the district court never attempted to accept a renewed waiver from Reczko. The court accepted his waiver on December 14, 2012, CR 1073, and the Government filed a superseding indictment on October 17, 2013. ER 131. Reczko was arraigned on that superseding indictment on November 27, 2013; by that point, he was acting as his own attorney. CR 1169. The magistrate court presiding over the arraignment accepted a renewed waiver of counsel from Reczko, *id.* at 5-6, but not so on the jury right. Even if this court finds that Reczko's initial jury waiver was valid, it should not apply to the superseding indictment on which he was ultimately tried.

69

intelligent." *Id.* at 968. So too here, and this Court should find that Reczko's jury waiver was not knowing and intelligent.

Because the error is structural, this Court should vacate Reczko's conviction on Count Two, and the district court's finding that his prior conviction qualified under the section 3559(e) sentencing enhancement, and remand for new trial.

## D. Reczko's prior state conviction did not qualify as a "prior sex conviction" involving a minor under 18 U.S.C. §3559(e).

### 1. Introduction and standard of review.

This Court reviews *de novo* whether Reczko's prior state conviction qualified as a prior sex conviction involving a minor, as defined in 18 U.S.C. § 3559(e). *See United States v. Brown*, 879 F.3d 1043, 1047 (9th Cir. 2018).

Section 3559(e) mandates a life sentence for any person convicted of a federal sex offense in which a minor is a victim, if that person has a "prior sex conviction in which a minor was the victim[.]" 18 U.S.C. § 3559(e)(1). Section 3559(e) defines "prior sex conviction" as a conviction for a "Federal sex offense" or "State sex offense." 18 U.S.C. § 3559(e)(2)(C).

Section 3559(e) further enumerates, *viz.*, limits, the term "Federal sex offense" to the following federal statutes: section 1591, 2241, 2242, 2244(a)(1), 2245, 2251, 2251A, 2422(b), or 2423(a). 18 U.S.C. § 3559(e)(2)(A). A "State sex offense" is one that consists of conduct that *would* be a Federal sex offense if it

would have involved interstate or federal commerce, or occurred on federal land. 18 U.S.C. § 3559(e)(2)(B)(i)-(ii).

In *Doss*, 630 F.3d at 1197, this Court explained that section 3559(e) requires a two-step "hybrid" approach to determine whether a person's prior conviction qualifies under the statute: first, the court determines whether the prior conviction is for a sex offense by applying the categorical approach; then, a fact finder, applying a beyond a reasonable doubt burden of proof, must determine whether the victim in the prior case was a minor.

Reczko was convicted of first degree rape under N.Y. Pen. L. § 130.35(1) in 1996. *See* CR 1133. That statute proscribes engaging in sexual intercourse with another person by forcible compulsion. N.Y. Pen. L. § 130.35(1). The jury instructions for section 130.35(1) in place at the time of Reczko's offense and conviction defined "forcible compulsion" as follows: "forcible compulsion means to intentionally compel either: (1) by the use of physical force; or (2) by a threat, express or implied, which places a person in fear of immediate death or physical injury to himself or herself [or another person] or in fear that he or she [or another person] will be immediately kidnapped."[33]

---

[33] *See* http://www.nycourts.gov/judges/cji/7-FormerCrimes/130pre2001/130-35%281%29.pdf; *see also* N.Y. Pen. L. § 130.00(8) (defining "forcible compulsion").

71

At Reczko's sentencing, the Government argued that his prior conviction qualified under section 3559(e) because N.Y. Pen. L. § 130.35(1) was a categorical match to 18 U.S.C. § 2241(a). CR 1128 at 13; CR 1135 at 7. Section 2241(a) proscribes engaging in a sexual act with another person by (1) "using force against that other person; or (2) by threatening or placing that other person in fear that any person will be subjected to death, serious bodily injury, or kidnapping." 18 U.S.C. § 2241(a). "Serious bodily injury" is defined as "bodily injury that involves a substantial risk of death, unconsciousness, extreme physical pain, protracted and obvious disfigurement, or protracted loss or impairment of the function of a bodily member, organ, or mental faculty." 18 U.S.C. § 2246(4).

The district court agreed and held that New York Penal Law section 130.35(1) was a categorical match to section 2241(a), and thus concluded that Reczko qualified for a mandatory life sentence under section 3559(e). ER 10. This finding is incorrect as a matter of law.

> **2. Reczko's prior conviction under New York Penal Law section 130.35(1) is categorically overbroad and does not qualify as a predicate under section 3559(e), and the district court erred when it held section 130.35(1) was a categorical match to section 2241(a).**

To determine whether a prior state conviction qualifies for a federal sentencing enhancement, courts employ the categorical approach set forth in *Taylor v. United States*, 495 U.S. 575 (1990). *Brown*, 879 F.3d at 1046. "Under

72

the categorical approach, [the Court is] concerned only with the fact of conviction and the statutory definition of the underlying offense." *Id.* (internal citations omitted). "If a state law proscribes the same amount of or less conduct than that qualifying [under federal law], then the two offenses are a categorical match." *Id.* (internal citations omitted, brackets in original). "But if the statute of conviction sweeps more broadly than the generic crime, a conviction under that law cannot categorically count as a qualifying predicate, even if the defendant actually committed the offense in its generic form." *Id.* at 1047 (internal quotations, citations, and brackets omitted).

New York Penal Law section 130.35(1) is not a categorical match to section 2241(a); it is categorically overbroad. Put differently, New York Penal Law section 130.35(1) encompasses a wider range of a conduct than section 2241(a). Thus, one may engage in conduct that violates New York Penal Law section 130.35(1), but does not violate section 2241(a).

While section 2241(a) proscribes sex with another by threatening or placing them in fear of "serious bodily injury," New York Penal Law section 130.35(1), in contrast, proscribes sex with another by placing them in fear of "physical injury." New York law defines "physical injury" as "impairment of physical condition or substantial pain." N.Y. Pen. L. § 10.00(9). Importantly, New York law distinguishes "physical injury" from "serious physical injury," which it defines as

73

"injury which creates a substantial risk of death, or which causes death or serious and protracted disfigurement, protracted impairment of health or protracted loss or impairment of the function of any bodily organ." N.Y. Pen. L. § 10.00(10).

In sum, New York Penal Law section 130.35(1) encompasses a wider range of conduct than section 2241(a), and one could therefore commit an act that constitutes a violation of New York Penal Law section 130.35(1), but not of section 2241(a)—specifically because section 2241(a) limits the proscribed conduct to threatening or putting another in fear of *serious bodily injury*, while New York Penal Law section 130.35(1) proscribes the act of putting another in fear of "physical injury," no matter how *de minimus*. Put simply, one could commit rape as defined by New York Penal Law section 130.35(1) by engaging in sex with another by placing them in fear of a slap to the face, *viz.*, injury that could cause impairment of physical condition, such as redness or bruising. But that same conduct would not constitute a violation of section 2241(a), because section 2241(a) requires threatening or placing another in fear of *serious bodily injury*.

The district court erred when it found New York Penal Law section 130.35(1) to be the "equivalent" of section 2241(a), and that it therefore qualified as a "prior sex conviction" involving a minor within the meaning of section 3559(e), triggering a mandatory life sentence. This Court should vacate Reczko's sentence on Count One and remand to the district court for resentencing.

74

**E.**     **The Court should vacate Reczko's convictions under *Burrage v. United States*, because the jury instructions misstated the law on the "for the purpose of" element of the section 2251 charge, and because the Government failed to submit sufficient evidence that Reczko engaged in sexually illicit conduct "for the purpose of" producing the images.**

**1.     Introduction and standard of review.**

Count One charged Reczko with "knowingly employ[ing], us[ing], persuad[ing], induc[ing], entic[ing], and coerc[ing] Elecita Del Rosario, then a 16-year old minor girl, to engage in sexually explicit conduct . . . in the Philippines, for the purpose of producing a visual depiction of such conduct, and [that he] intended such visual depiction to be transported to the United States, and did transport such visual depiction to the United States[.]" ER 119-22, 131-33. The district court did not define what "for the purpose of" meant. *See* ER 25-29.

Before trial, the Supreme Court decided *Burrage*. *Burrage* establishes that the jury instructions submitted were incorrect. Judge Sutton's opinion in *United States v. Miller*, 767 F.3d 585 (6th Cir. 2014) also demonstrates reversible error under *Burrage*. Because Reczko did not object to the errant instruction, the Court reviews for plain error. *See United States v. Alferahin*, 433 F.3d 1148, 1154 (9th Cir. 2006). "A trial court commits plain error when (1) there is error, (2) that is plain, and (3) the error affects substantial rights." *United States v. Fuchs*, 218 F.3d 957, 961-62 (9th Cir. 2000). This Court exercises its discretion to notice the error

75

when the error "seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id.*

**2.     There was plain error under *Burrage* and *Miller*.**

In *Burrage*, the Supreme Court addressed whether a defendant's distribution of drugs resulted in the victim's death; the Government advocated a standard which required the defendant's conduct to be a "substantial" or "contributing" factor in producing the result. *Burrage*, 134 S. Ct. at 890.

The Supreme Court rejected that standard. It held that a "but-for" standard applied, and explained:

> Unsurprisingly, [the Government] could not specify how important or how substantial a cause must be to qualify. . . Is it sufficient that use of a drug made the victim's death 50 percent more likely? Fifteen percent? Five? Who knows. Uncertainty of that kind cannot be squared with the beyond-a reasonable-doubt standard applicable in criminal trials or with the need to express criminal laws in terms ordinary persons can comprehend.

*Id.* at 892.

Under *Burrage*, the jury instruction here was plainly erroneous. The jury should have been instructed that to prove Reczko "employed, used, persuaded, induced, enticed, or coerced" Del Rosario "for the purpose of producing a visual depiction of" sexually explicit conduct, it had to find that the sexually illicit conduct would not have occurred *but for* Reczko's desire to produce the images.

76

Put differently, if the images were merely incidental to the illicit sexual conduct, then the jury could not convict.

Importantly, *Burrage* made it clear that a but-for standard was not limited to "results from" language; rather, it applies broadly, and reaches statutory terms like "because of," "based on," and "by reason of." *Id.* at 889. The "for the purpose of" language in section 2251(c)(1) is like the "by reason of" or "because of" language highlighted in *Burrage*. And, the Supreme Court specifically relied on its "mixed motive" cases to justify its analysis of the but-for standard. *See id.* at 888-89 (an impermissible motive must be the but-for cause of an adverse employment decision).

Judge Sutton's recent opinion in *Miller*—which issued before trial— reinforces Reczko's reliance on *Burrage*. In *Miller*, 767 F.3d at 589, the defendants were charged with federal hate crimes, specifically assaulting the victims because of their religion. At a pre-*Burrage* trial, the district court instructed the jury "that the faith of the victims must be a 'significant factor' in motivating the assaults" but did not instruct that the religion of the victims had to be a but-for cause of the assaults. *Id.* at 589. The Sixth Circuit reversed based on *Burrage*, finding that the "motive element" required "a showing that [the defendants] would not have acted *but for* the victim's actual or perceived religious beliefs." *Id.* at 591.

77

Judge Sutton emphasized that the but-for standard applies regardless of whether the critical element is "an easier-to-show prohibited act or a harder-to prove prohibited motive." *Id.* at 591-92.

> That conclusion makes good sense in the context of a criminal case implicating the motives of the defendants. The alternative proposed definition of the phrase ('significant motivating factor') does not sufficiently define the prohibited conduct. How should a jury measure whether a specific motive was significant in inspiring a defendant to act? Is a motive significant if its one of three reasons he acted? One of ten?

*Id.* at 592.

Just as the Supreme Court concluded in *Burrage*, Judge Sutton concluded that the substantial factor standard is impermissibly vague for a criminal statute, and even if there were any doubt, the rule of lenity would compel the but-for standard for motive. *Id.*

In sum, *Burrage* and *Miller* establish plain error. *See Henderson v. United States*, 133 S. Ct. 1121 (2013) (The plainness of the error is evaluated at the time of appellate consideration). Even where there is a conflict among other courts, an error can still be "plain." *See United States v. Brown*, 352 F.3d 654, 664 (2d Cir. 2003) ("[T]he 'plainness' of the error can depend on well-settled legal *principles* as much as well-settled *precedents*. We can, in certain cases, notice plain error in the absence of direct precedent, or even where uniformity among the circuits, or

78

among state courts, is lacking"). Here, *Miller* sets forth a straightforward

application of *Burrage* to a similar motive element:

> What seems clear to us today, we must acknowledge,
> might not have looked as clear at the time of trial. It was
> not until 2014, when the Court decided *Burrage*, that
> several contours of this debate came into focus. In
> deciding that the phrase 'results from' in a criminal
> statute requires but-for causation, *Burrage* made several
> points directly applicable here. It noted that, under
> dictionary definitions, 'results from' ordinarily 'imposes
> ... a requirement of actual causality.' 134 S.Ct. at 887. It
> noted that, under its decisions in *Nassar*, *Gross* and *Burr*,
> 'results from' and 'because of' customarily mean the
> same thing and that both phrases require but-for
> causation. *Id.* at 888–89. It cited decisions from other
> courts that reached the same conclusion, including one
> similar to this case—an Iowa Supreme Court decision
> interpreting 'because of' in the motive element of Iowa's
> hate-crime statute to require a showing of but-for
> causation. *Id.* at 889 (citing *State v. Hennings*, 791
> N.W.2d 828, 833–35 (Iowa 2010)). And it relied on the
> criminal setting of the statute to require but-for causation
> rather than some lesser causal connection between the
> defendant's actions and the victim's death. *Id.* at 891-92.
> Just so here: The 'because of' element of a prosecution
> under the Hate Crimes Act requires the government to
> establish but-for causation.

The defective jury instruction omitting the proper definition for the "for the

purpose of" language constituted significant and constitutional error. *See Dixon v.

Williams*, 750 F.3d 1027, 1032 (9th Cir. 2014); *see also Deck v. Jenkins*, 814 F.3d

954, 978-82 (9th Cir. 2016). If this Court somehow finds that the instruction was

not erroneous, it was at least ambiguous as to the requisite proof for the motive

element of the sole offense tried to the jury. *See Dixon*, 750 F.3d at 1033; *Ho v. Carey*, 332 F.3d 587, 592 (9th Cir. 2003). Even "ambiguous" instructions violate due process if the jury could have "applied the instruction[s] in a way that relieved the State of its burden of proving every element of the crime beyond a reasonable doubt." *Waddington v. Sarausad*, 555 U.S. 179, 190-91 (2009). The instructions relieved the Government of proving the motive element of the section 2251 offense.

### 3. The error affected Reczko's substantial rights and supports reversal.

Under the third prong of the plain error test, *i.e.*, the "harmless error inquiry[,]" the Court assesses whether the error "affected the outcome of the district court proceedings[.]" *United States v. Recio*, 371 F.3d 1093, 1100-01 (9th Cir. 2004) (citations omitted). The trial record shows that it did.

The district court's omission of an instruction defining the "for the purpose of" language in Count One permitted the jury to convict Reczko even if it found that the images were merely incidental to the illicit sexual conduct with Del Rosario, which under *Burrage*, would be legally inadequate. But the evidence at trial supports the notion that the jury indeed concluded that, and convicted anyway, because Reczko and Del Rosario were in a consensual and long-term relationship. Indeed, the two of them moved into an apartment together, and even married, all

80

with the approval of Del Rosario's parents. Further undisputed was that the two of them had sex long before those images were taken, and Del Rosario did not decide to leave Reczko, and subsequently report him, until approximately six months after the images were taken. In short, Reczko did not engage in sexually illicit conduct with Del Rosario for the purpose of creating the images; rather, the images were merely incidental to their sexual relationship.

As Judge Sutton recognized, "[a]n improper instruction on motive and but-for causation poses a thorny issue that frequently will not be harmless. Experience bears this out." *Miller*, 767 F.3d at 600. This Court should vacate Counts One and Two, and remand for new trial before a properly instructed jury.

### 4. The Government failed to present sufficient evidence to sustain a conviction on the section 2251(c) count under *Burrage v. United States*.

For the same reason discussed under *Burrage* and *Miller* above, the Government also failed to sustain its burden and submit sufficient evidence on Count One, because it failed to prove beyond a reasonable doubt that find that the sexual conduct would not have occurred *but for* Reczko's desire to produce the images. Because Reczko preserved a Rule 29 motion, *see* ER 117, this Court conducts *de novo* review. *See e.g., United States v. Goyal*, 629 F.3d 912, 914 (9th Cir. 2010); *United States v. Orduno-Aguilera*, 183 F.3d 1138, 1139-40 (9th Cir. 1999). The Government's evidence at trial established, at most, that the images on

81

the "Baby Wow" CD were merely incidental to the sexual conduct. Simply put, the sexual conduct would have occurred with or without the production of the images. Because that proof falls short under *Burrage*, this Court should reverse Count One and enter a judgment of acquittal.

**F.    The district court abused its discretion when it denied Reczko's Rule 15 motions as to witnesses Judge Gil Acosta and Mary Lou Cabanas.**

**1.    Introduction and standard of review.**

This Court reviews the district court's denial of Reczko's motions for foreign depositions under Fed. R. Crim. P. 15 for abuse of discretion. *United States v. Olafson*, 213 F.3d 435 (9th Cir. 2000). A district court abuses its discretion when it makes a "clearly erroneous" finding of fact. *United States v. Hinkson*, 585 F.3d 1247, 1259-60 (9th Cir. 2009) (*en banc*). A district court also abuses its discretion if it applies an incorrect legal standard. *Id*. at 1261-62.

"Rule 15(a) allows the district court broad discretion in deciding whether to order depositions in a criminal case and explicitly states that such depositions will be reserved for exceptional circumstances where it is in the interest of justice that the testimony of a prospective witness . . . be taken and preserved for use at trial[.]" *Olafson*, 213 F.3d at 442 (internal quotations and brackets omitted). The district court must consider "the particular circumstances of each case to determine

82

whether the 'exceptional circumstances' requirement has been satisfied." *United States v. Omene*, 143 F.3d 1167, 1170 (9th Cir. 1998).

"Ordinarily, exceptional circumstances exist when the prospective deponent is unavailable for trial and the absence of the testimony would result in an injustice." *United States v. Sanchez-Lima*, 161 F.3d 545, 548 (9th Cir. 1998). "This Court has held that it is unjust to deprive a defendant of what may be crucial exculpatory evidence." *Id.* In ruling on the motion, the district court may consider a witness's unavailability, the movant's good faith effort to obtain the witness's presence at trial, whether the movant demonstrated that the expected testimony would be favorable, and whether the deponents would be available for deposition and willing to testify. *United States v. Zuno-Arce*, 44 F.3d 1420, 1425 (9th Cir. 1995).

Importantly, the prerequisites for *taking* a deposition under Rule 15 differ from those for *admitting* a deposition into evidence. *See Omene*, 143 F.3d at 1170; *United States v. Sines*, 761 F.2d 1434, 1439 (9th Cir. 1985). "Rule 15(a) does not require any conclusive showing of unavailability or material testimony before a deposition *can be taken* in a criminal case." *Id*. (emphasis added). Rather, "Rule 15(a) only requires that the trial court find that due to exceptional circumstances it is in the interest of justice that the testimony of a prospective witness be taken and preserved for possible use at trial." *Id*.

83

Reczko first moved for Rule 15 depositions on August 25, 2010, CR 224, 225, 233, which the district court denied on October 12, 2010, finding that Reczko failed to show that some of the witnesses would be unable to testify, and further failed to show what the witnesses would testify about. ER 111-12. Reczko again moved for Rule 15 depositions on September 12, 2012. ER 157. The district court denied the motion in part on January 18, 2013. ER 906. Specifically, the court denied depositions for Judge Gil Acosta and Mary Lou Cabanas on the basis that both had "expressly stated that they [were] unwilling to cooperate at trial or deposition." ER 90.

In both motions, Reczko proffered why preserving Judge Acosta's and Cabanas's testimonies was critical: they would give exculpatory accounts and both testify about the fraudulent documents submitted by Del Rosario's parents, which stated that Del Rosario was of age, establishing that Reczko was misled as to her age, which could have been used to present a mistake of age defense.

### 2. The district court's exclusive focus on the witnesses' apparent refusal to cooperate when denying the motion was an abuse of discretion.

The only reason the district court denied Reczko's Rule 15 motion as to Judge Acosta and Cabanas—both critical witnesses who could have provided exculpatory testimony—was because both had "expressly stated that they [were] unwilling to cooperate at trial or deposition." ER 908. The district court's

84

exclusive focus on only that point, and its denial of the Rule 15 motion for that reason—and apparently no other—was an abuse of discretion.

Exceptional circumstances for Judga Acosta's and Cabanas's depositions were present. As proffered by Reczko, both witnesses were critical to his mistake of age defense. Moreover, both had apparently refused to cooperate and travel to the United States and testify, rendering preservation of their testimony for trial all the more important. Simply put, these witnesses would have provided critical exculpatory evidence that Reczko was falsely led to believe that Del Rosario was of age, *viz.*, a complete defense to the charges.[34] The denial of this testimony resulted in Reczko's inability to present a defense, *viz.*, an injustice. *See Sanchez-Lima*, 161 F.3d at 548.[35]

---

[34] Importantly, Del Rosario testified at trial that she signed a document which fraudulently purported that she was of "legal age" to marry, *viz.* 18, at the time of her marriage to Reczko. CR 1177 at 30-35.

[35] The district court's denial also effectively precluded Reczko from exercising his Sixth Amendment right to present a defense. *See Sanchez-Lima*, 161 F.3d at 548. By denying his motion to depose Judge Acosta and Cabanas, the district court prevented him from presenting an affirmative defense.

The court's denial of Reczko's request to depose these witnesses also illustrates why the Government's prosecution of United States citizens for conduct committed abroad is so problematic. Here, the Government opted to prosecute Reczko for conduct that was lawful in the country where it occurred. The Government was able to secure the presence of *its* witnesses at trial by invoking its rights under the MLAT. Yet, Reczko was totally deprived of the chance to *even*

Moreover, the district court's basis in denying the motion—that Judge Acosta and Cabanas were unwilling to cooperate in depositions—was largely its own speculation. Reczko did not submit any proffer about the witnesses' lack of cooperation in his second Rule 15 motion. Indeed, that proffer was only made in his first Rule 15 motion, which was filed over two years before the second motion. *Compare* ER 157-81 *with* CR 224, 225, 233. At a hearing on the second Rule 15 motion, the district court inquired with defense counsel Bassis about this issue, and defense counsel informed the court that while Judge Acosta and Cabanas had previously said they would not cooperate, "there were administrative proceedings ongoing in Cebu which may have affected [their] opinion." ER 136. Bassis further noted that she, at a minimum, knew that the witnesses would not travel for trial, and the defense at least "need[ed] to make the effort. If they refuse to testify, refuse to appear, then it's a very short deposition, basically." ER 137. In short, the district court had no basis to affirmatively conclude that these witnesses would not cooperate, especially in light of defense counsel's representations.[36]

---

*attempt to preserve exculpatory testimony* from witnesses who were unwilling to travel and were beyond the United States's subpoena power.

[36] While the court was required to consider their willingness to testify, *Olafson,* 213 F.3d at 442, if the potential deponents were *still* unwilling to cooperate, the court should have granted leave to conduct a deposition, and the defense team could have attempted to secure their depositions; if that attempt failed, then it only prejudiced Reczko.

In sum, "exceptional circumstances" existed for the taking of Judge Acosta's and Cabanas's depositions, because both possessed critical exculpatory testimony and were unwilling to travel to the United States for trial. The district court's denial resulted in an injustice. The district court abused its discretion when it denied Reczko's Rule 15 motion as to those witnesses solely based on its own speculation that they would not cooperate. This Court should reverse Reczko's conviction on Count One and remand for new trial.

## G. Reczko's mandatory life sentence under 18 U.S.C. § 3559(e) violates the Eighth Amendment.

As a result of his prior sex conviction from 1996, Reczko was sentenced to a mandatory life term under 18 U.S.C. § 3559(e). But for his prior conviction, the maximum sentence Reczko would have faced was 30 years. *See* 18 U.S.C. § 2251(e). And before Reczko proceeded to trial, the Government extended a 10-year plea offer, which he rejected. This Court should find that Reczko's life sentence under section 3359(e) violates the Eighth Amendment and is therefore unconstitutional and invalid. This Court reviews Reczko's challenge *de novo*. *United States v. Meiners*, 485 F.3d 1211, 1213 (9th Cir. 2007).

"The Eighth Amendment, which forbids cruel and unusual punishment, contains a narrow proportionality principle that applies to noncapital sentences."

87

*Ewing v. California*, 538 U.S. 11, 20 (2003). Under the Eighth Amendment, a court may find a statute unconstitutional if it is grossly disproportionate to the offense. *Lockyer v. Andrade*, 538 U.S. 63 (2003).

A defendant may challenge their sentence on proportionality grounds under the Eighth Amendment in two ways: either through an "as-applied" challenge, or through a "categorical" challenge. *See United States v. Williams*, 636 F.3d 1229, 1232-33 (9th Cir. 2011) (citing *Graham v. Florida*, 560 U.S. 48 (2010). Reczko contends his life sentence violates the Eighth Amendment under the as-applied approach.

The "as-applied" approach "first challenges the sentence as disproportionate given all the circumstances in a particular case." *Id.* at 1232 (internal quotations and citations omitted). Under this approach, the Court "first compare[s] the gravity of the offense to the severity of the sentence." *Id.* While this Court has indicated that this analysis rarely results in an inference that the sentence was grossly disproportionate, if such an inference does arise, then "the [C]ourt should . . . compare the defendant's sentence with the sentences received by other offenders in the same jurisdiction and with the sentences imposed for the same crime in other jurisdictions." *Id.*

88

Section 2251(c) encompasses a broad range of conduct.[37]  Reczko contends

that his conduct here lies on the less-serious end of that range.  First, Reczko and

Del Rosario were involved romantically.  And while the Government may seek to

characterize Reczko's conduct as "abuse", *see* CR 1054 at 15, it can't dispute the

evidence at trial, as submitted by Del Rosario: she and Reczko were in a dating

relationship, and in January 2006, when Del Rosario was 16, entered into a

marriage that was, unbeknownst to Reczko at that time, a sham.  This marriage was

approved by Del Rosario and her parents.

Following their marriage, the two rented an apartment together, and even

after Del Rosario left Reczko in 2007, she admitted that she continued to see him

on and off.  During the course of their relationship, they would have sex, and on

several occasions in November 2006, Reczko took photographs of them engaged in

sex.  In sum, Reczko was convicted and sentenced for taking photographs of

himself having consensual sex with a 16-year-old female who he, at the time,

believed was his lawful wife, and then traveling with those images to the United

States.[38]

---

[37] Indeed, Congress acknowledged this, as evidenced by the wide sentencing
range under section 2251: 15 to 30 years if the defendant has no prior conviction.

[38] Of note, Reczko's act of engaging in consensual sex with a 16-year-old
was not only lawful in the Philippines, but also would be deemed lawful in many

Importantly, there was no evidence that Reczko took these photographs for any purpose other than for his and Del Rosario's own benefit, *viz.*, there was no evidence Reczko shared or distributed the images. Indeed, Reczko's act of burning the images onto a CD, returning with them to the Philippines, and storing the CD in the apartment he shared with Del Rosario establishes that the images were solely for personal use.

Given this conduct, a mandatory sentence of life imprisonment is "grossly disproportionate" to Reczko's conduct, because *but for* Reczko's prior conviction, he would be subject to a mandatory minimum of 15 years, and a maximum of 30.[39] Thus, the nature of the offense vis-à-vis its punishment raises an inference of disproportionality. That disproportionality is further established when Reczko's case is compared to other similar cases, in which defendants received lighter sentences for far more serious conduct.

For example, in *Meiners*, 485 F.3d at 1212, the defendant "operated a child pornography server [] which he utilized to advertise child pornography images for distribution in exchange for other child pornography images to be sent to him." Law enforcement searched his home and "seized computer equipment containing

---

of the States. *See* https://en.wikipedia.org/wiki/Ages_of_consent_in_the_United_States.

[39] Reczko's conduct would be punishable by a sentence of up to only eight years under California state law. *See* Cal. Pen. Code § 311.4.

90

10,000-12,000 pornographic images, some of which depicted children engaged in sado-masochistic activity, including bondage and sexual intercourse." *Id.* The defendant was convicted of nine counts in total: four counts of advertisement of child pornography, in violation of 18 U.S.C. § 2251(d), four counts of distribution of child pornography, in violation of 18 U.S.C. § 2252A(a)(2), and one count of possession of child pornography, in violation of 18 U.S.C. § 2252A(a)(5)(B). *Id.* The district court sentenced the defendant to 15 years—*viz.*, the mandatory minimum that Reczko would have faced but for his prior conviction, and five years more than he was offered by the Government before trial.

This Court found the defendant's sentence constitutional under the Eighth Amendment because it was "not grossly disproportionate to the gravity of his offense." *Id.* at 1213. Moreover, the Court found that by advertising and distributing child pornography—thousands of images worth—the defendant "directly encouraged the production and distribution of material that is created by abusing children." *Id.* Meiners's conduct stands in contrast with Reczko's, because Meiners actively advertised and distributed thousands of images of child pornography, some of which depicted children engaged in "sado-masochistic activity."

Comparison to other section 2251 cases further establishes the disproportionality of Reczko's sentence. *See e.g., United States v. Henry*, 827 F.3d

91

16 (1st Cir. 2016) (defendant, a sex trafficker, produced videos of himself having sex with 15-year-old girl who had previously been reported missing, and shared the video with multiple individuals, sentenced to 15 years); *United States v. Hinkley*, 803 F.3d 85 (1st Cir. 2015) (defendant sentenced to 25 years for threatening and coercing young learning-disabled boys to masturbate on a webcam and streaming the video on a social media site).

And the same is true when comparing Reczko's case to other section 2251 cases involving recidivist defendants. *See e.g., United States v. Bevins*, 848 F.3d 835 (8th Cir. 2017) (defendant sentenced to 25 years for producing images of himself sexually abusing minors, including a nine-year-old, in addition to possession of child pornography, despite evidence that defendant had produced images of child pornography in the past, and previously engaged in prohibited sexual conduct); *United States v. Sullivan*, 797 F.3d 623 (9th Cir. 2015) (defendant, while on parole for conspiracy to commit pandering involving a 13-year-old girl, coerced a 14-year-old girl to live with him in a motel, "controlled all of her daily activities[,]" bought her adult clothing, "punished" her for trying to leave him, produced several videos and images of them having sex, and even posted a photo of her on an adult website, sentenced to 25 years); *United States v. Johnson*, 451 F.3d 1239 (11th Cir. 2006) (defendant, a repeat sex offender, sentenced to 140 years on sections 2251 and 2252A convictions, after, over a

period of several years, he took pornographic videos of adolescent children, and introduced adolescent children to other men for sexual purposes).

In sum, Reczko's mandatory life sentence, imposed only by virtue of his prior conviction, for photographing himself having consensual sex with a 16-year-old, does not serve any legitimate goal. *See, e.g.*, *In re Ellis*, 356 F.3d 1198, 1220 (9th Cir. 2004) (*en banc*) (Kozinski, J., concurring) ("I am aware of no respectable support for mandatory minimums . . . . In fact, our most distinguished jurists and commentators have spoken out against the Procrustean regime of mandatory minimum sentences, and in favor of sentences that reflect the informed discretion of the trial judge.") This Court should find that Reczko's life sentence, imposed pursuant to section 3559(e), violates the Eighth Amendment and remand for resentencing without regard to section 3559(e)'s unconstitutional sentencing scheme.

**H.    The Court should reverse Reczko's convictions and sentence for cumulative error.**

The cumulative effect of the errors in this brief support reversal under due process, *see, e.g., Parle v. Runnels*, 505 F.3d 922, 927-28 (9th Cir. 2007), and the common law. *See, e.g., United States v. Frederick*, 78 F.3d 1370, 1381 (9th Cir.1996). Even if a claim is only reviewed for plain error, it is considered in the cumulative analysis. *See, e.g., United States v. Fernandez*, 388 F.3d 1199, 1256-

93

57 (9th Cir. 2004). Likewise, "if any error is constitutional, then aggregate error should be reviewed under [the] harmless beyond a reasonable doubt standard[.]" *United States v. Necochea*, 986 F.2d 1273, 1283 (9th Cir. 1993).

## CONCLUSION

For the foregoing reasons, Reczko respectfully requests this Court vacate his convictions, enter a judgment of acquittal on count one and strike the section 3559(e) enhancement, or at a minimum, remand for a new trial on both counts. In the alternative, he asks this Court find his sentence under section 3559(e) unconstitutional, and remand for resentencing without regard to the unconstitutional mandatory life requirement under section 3559(e).

Respectfully submitted,

DATED: June 28, 2018                COLEMAN & BALOGH LLP


*/s/ E A Balogh*
ETHAN A. BALOGH
DEJAN M. GANTAR
235 Montgomery Street, Suite 1070
San Francisco, California 94104
Telephone: 415.391.0440

Attorneys for Appellant
STANLEY DAN RECZKO III

## <u>CERTIFICATE OF RELATED CASES</u>

In accordance with Ninth Circuit Rule 28-2.6, counsel reports that he

is not aware of any related case.

*/s/ E A Balogh*

Dated: June 28, 2018           ETHAN A. BALOGH

<u>**CERTIFICATE OF COMPLIANCE**</u>

Pursuant to Fed. R. App. P. 32 and Ninth Circuit Rules 32-1 and 32-2,

the attached Opening ~~/Answering/Reply~~ Brief is:

        Proportionately spaced, has a typeface of 14 points or more, and contains 22,040 words.

                      */s/ E A Balogh*

Dated: June 28, 2018           ETHAN A. BALOGH

## **PROOF OF SERVICE**

I, Ethan A. Balogh, certify that on the date set forth below, I caused to be filed electronically a redacted copy of this Appellant Stanley Reczko's Opening Brief on Appeal with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system, and that all parties to whom I am required to provide service are registered CM/ECF users, and that service of the redacted Opening Brief shall be accomplished by the appellate CM/ECF system.

I further certify that I caused to be filed electronically and Under Seal, an un-redacted copy of the Opening Brief with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system. I further certify that, with respect to the Opening Brief filed Under Seal, I will, having obtained prior approval, provide a copy of that document via electronic mail to:

Joey Blanch
Joey.blanch@usdoj.gov
Assistant United States Attorney


                                        */s/ E A Balogh*
Dated: June 28, 2018              ETHAN A. BALOGH